Marilyn J. BARTLETT, Plaintiff,

v.

NEW YORK STATE BOARD OF LAW EXAMINERS; James T. Fuller, Individually and as Executive Secretary, New York State Board of Law Examiners; John E. Holt–Harris, Jr., Individually and as Chairman, New York State Board of Law Examiners; Richard J. Bartlett, Individually and as Member, New York State Board of Law Examiners, Laura Taylor Swain, Individually and as Member, New York State Board of Law Examiners, Charles T. Beeching, Jr., Individually and as Member, New York State Board of Law Examiners and Ira P. Sloane, Individually and as Member, New York State Board of Law Examiners, Defendants.

No. 93 Civ. 4986(SS).

United States District Court,
S.D. New York.

July 3, 1997.

Jo Anne Simon, Patricia Ballner, Brooklyn, NY, for plaintiff.

Dennis Vacco, Attorney General of State of New York, New York City, Judith T. Kramer, Rebecca Ann Durden, Assistant Attorneys General, for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

#### OPINION

SOTOMAYOR, District Judge.

### INTRODUCTION

This case, tried to the bench in 21 days of testimony accompanied by exhibits and briefs aggregating to more than 5000 pages, principally devolves to the meaning of a single word—*substantially*—as used in the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101–12213 (1995) and the Rehabilitation Act, 29 U.S.C. §§ 701–796 (1985) ("Section 504" or the "Rehabilitation Act"). Both Acts define a disability as "a physical or mental impairment that *substantially* limits one or more of" an individual's "major life activities." 42 U.S.C. § 12102(2)(A) (1995 Supp.); 29 U.S.C. § 706(8)(B) (1996 Supp.) (emphasis added).

Plaintiff claims she suffers from a learning disability that impairs her reading and her ability to be able to work as a lawyer. At issue in this case is whether plaintiff suffers from an impairment, and if so, whether it rises to the level of a substantial limitation cognizable under the ADA, thus entitling her to accommodations in taking New York State's Bar Examination. She sues for injunctive and other relief under Titles II and III of the ADA, Section 504 of the Rehabilitation Act, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and 42 U.S.C. § 1983.

The evidence at trial has convinced me that Marilyn Bartlett suffers from a learning deficit that evinces itself as a difficulty in reading with the speed, fluency and automaticity of an individual with her background and level of intellectual ability. Despite this impairment, plaintiff obtained a Ph.D. in Educational Administration and a law degree. By virtue of superior effort and not a small amount of courage, Marilyn Bartlett has been able to succeed academically and professionally despite the limitations her impairment has placed upon her.

But this case asks whether, in light of the confined language of the law, plaintiff is not merely impaired, but disabled.

The term "substantially limited" is defined in 29 C.F.R. § 1630.2(j)(1)(ii) as:

(ii) Significantly restricted as to the *condition, manner or duration under* which an individual can perform a particular major life activity as compared to the *condition, manner, or duration* under which the average person in the general population can perform that same major life activity.

(emphasis added).[1] Similarly, with respect to the major life activity of working, "substantially limited" is defined by 29 C.F.R. § 1630.2(j)(3)(i) to mean "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the *average person having comparable training, skills and abilities*" (emphasis added). Regulations such as the foregoing must be accorded substantial deference because they reflect and incorporate active Congressional intervention in their fashioning. *See School Bd. of Nassau County v. Arline,* 480 U.S. 273, 279, 107 S.Ct. 1123, 1126–27, 94 L.Ed.2d 307 (1987) (citing *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 634–35, 104 S.Ct. 1248, 1254–55, 79 L.Ed.2d 568, & nn. 14–16 (1984)) (construing regulations adopted pursuant to the Rehabilitation Act).

For those of us for whom words sing, sentences paint pictures, and paragraphs create panoramic views of the world, the inability to identify and process words with ease would be crippling. Plaintiff, an obviously intelligent, highly articulate individual reads slowly, haltingly, and laboriously. She simply does not read in the manner of an average person. I reject the basic premise of defendants' experts that a learning disability in reading can be identified solely by a person's inability to decode, *i.e.,* identify words, as measured by standardized tests, and I accept instead the basic premise of plaintiff's experts that a learning disability in reading has to be identified in the context of an individual's total processing difficulties.

Having witnessed all of the trial testimony and having studied the thousands of pages of exhibits, affidavits and depositions, I conclude that plaintiff is not able to read in the same condition, manner or duration as an average reader when measured against "the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). For this reason, I find that plaintiff is substantially impaired under the law, and she is therefore entitled to receive reasonable accommodations in taking the New York State Bar Examination.

For the reasons to be discussed, I deny plaintiffs equal protection, due process, and § 1983 claims.

I award her injunctive relief, and compensatory, but not punitive, damages.

## *BACKGROUND*

### I. UNDISPUTED FACTS

The following consists substantially of undisputed facts taken from the joint pretrial order submitted by the parties. The Court has added, where indicated, some additional facts to this section in order to clarify or complete the presentation set forth in the undisputed facts agreed to by the parties.

#### A. *Parties*

Plaintiff is a law school graduate who has met all the qualifications necessary to take the New York State Bar Examination. Defendants John Holt–Harris, Jr., Richard J. Bartlett, Laura Taylor Swain, Charles T. Beeching, Jr., Ira P. Sloane, and James T. Fuller, as Executive Secretary, are the members of the New York State Board of Law Examiners (the "Board"), and as such are responsible for the administration of the New York State Bar Examination.

#### B. *The Bar Examination*

The Board is authorized to conduct a written bar examination, twice a year, consisting of legal problems in both "adjective and sub-

---

1. There are no significant textual or jurisprudential distinctions in the definition of disability, the burdens of proof or remedies between the ADA and Section 504. Accordingly, the definitions under both Acts are interchangeable for purposes of this case.

stantive law." (N.Y.Comp.Codes R. & Regs. tit. 22, § 520.7 ("22 NYCRR")).

The Bar Examination is given over two days and tests the candidates' knowledge of legal principles and concepts that are relevant and important to the practice of law. The Board's mandate is to test for minimal competence to practice law. One day is devoted to answering the New York portion of the test, created by the Board and consisting of 50 multiple-choice questions and six essay questions. Unless an accommodation of extra time is granted for a disability, the New York portion of the test must be completed within six hours: a three-hour session in the morning and a three-hour session in the afternoon. The second day, which may be taken in another state, is devoted to the 200 multiple-choice questions of the Multistate Bar Examination ("MBE"), created by the National Conference of Bar Examiners. The MBE normally takes six and one-half hours. If the candidate elects to take the MBE in New York, it is administered by the Board as part of the New York State Bar Examination. A combined score of 660 on the MBE and the New York portion of the test is needed to pass the Bar Examination. According to trial testimony, spelling errors in responding to questions are not penalized on the Bar Examination. The Court accepts plaintiff's contention, however, that difficulties in spelling affects the clarity of the presentation and detracts from the expression of concepts.

Title 22 NYCRR § 220.13 authorizes the Board to adopt, amend or rescind rules it deems necessary and proper to enable it to discharge its duties. Title 22 NYCRR § 6000.4(a) permits applicants to apply for accommodations for the Bar Examination based upon a disability. It is the policy of the Board to provide accommodations in testing conditions to candidates with disabilities to the extent such accommodations are reasonable, consistent with the nature and purpose of the examination, and necessitated by the candidate's disability.

The Board has provided, *inter alia*, the following accommodations to applicants with disabilities: granted access to food and drink, provided a private room in which to take the examination and large print examinations, permitted up to double the amount of time over two days to take the examination, and approved use of a computer or amanuensis to record answers. If the MBE is taken in New York by a candidate to whom the Board has granted accommodations, the same accommodations apply to the MBE portion of the test.

To request accommodations, an applicant completes a form enclosed with the application and returns it with supporting documentation to the Board. *See* 22 NYCRR § 6000.4(b). The supporting documentation must state the nature of the candidate's disability, the requested accommodation, the causal relationship between the disability and the applicant's ability to take the Bar Examination without the requested accommodations, and the reason the specific accommodation requested by the candidate is required. *See* 22 NYCRR § 6000.4(c).

The Board's rules also require applicants to provide documentation of the three most recent testing accommodations, if any, granted to the candidate by academic institutions, licensure authorities, or other test administrators. *See* 22 NYCRR § 6000.4(c).

The Board has the discretion to require applicants to provide additional information relating to the disability and/or prior accommodations, and may also request that applicants submit to an examination by an expert designated by the Board in connection with an applicant's request for testing accommodations. *See* 22 NYCRR § 6000.4(d).

If a requested accommodation is denied, either in whole or in part, the Board's notification must state the reason for the denial. The candidate may appeal the decision to the Board. *See* 22 NYCRR § 6000.4(e). The Board must notify the applicant of its determination no later than twenty days prior to the date of the examination for which the accommodations are requested.

Title 22 NYCRR § 6000.4(f) defines the term "disability" as a "physical, neurological or learning disability" and the term "candidates with disabilities" as an "otherwise qualified candidate having such disabilities."

The Board in its discretion may delegate to its members, its Executive Secretary or Deputy Executive Secretary, all or any part of its duties and responsibilities in granting or denying accommodations, with the exception of the responsibilities relating to appeals. *See* 22 NYCRR § 6000.4(g).

### C. *Plaintiff's Educational Background*

In 1970, plaintiff received a B.S.Ed. in Early Childhood Teacher Education from the State College at Worcester, Massachusetts. She graduated with a grade point average of 2.10. Plaintiff did not receive accommodations while at State College.

Plaintiff thereafter took the Graduate Record Examination without accommodations.

In 1976, plaintiff received a M.Ed. in Special Education, Educational Disturbances in Children, from Boston University. She graduated with a grade point average of 3.8. Plaintiff did not receive accommodations while at Boston University.

In the Fall of 1976, plaintiff entered the Ph.D. program in Educational Administration at New York University. Plaintiff first requested and received accommodations for the 1977 Summer semester. Plaintiff had not been formally diagnosed with a learning disability prior to receiving these accommodations. The Court accepts the plaintiff's and Dr. Evan's testimony that then-Ph.D. Program Director, Seymour Evans, who had knowledge of and experience with learning disabilities, recommended plaintiff for accommodations after he had worked with her and noted her reading difficulties.

New York University did not request, and plaintiff did not submit, any documentation of a learning disability in support of her request for accommodations. The accommodations granted to plaintiff at New York University included unlimited time to complete final examinations, unlimited time to take the written comprehensive examinations, use of an electronic typewriter with correction capability to take examinations, and the use of a department secretary as an amanuensis.

Plaintiff was not granted accommodations for her examinations in statistics and administration, courses taught in another department. Plaintiff fulfilled her Ph.D. foreign language requirement by reading a passage in German and answering questions on the passage for the head of the German department. Plaintiff received her Ph.D. in 1981.

Plaintiff did not request accommodations for the Law School Aptitude Test, and she scored 32 out of a possible 48.

Plaintiff entered Vermont Law School in 1988. Plaintiff did not request accommodations during her first year of law school. Plaintiff's grade point average during that first year was 2.09, with a class ranking of 155 out of 166 students.

Plaintiff first requested and received accommodations during law school for the Fall 1989 examination period. Plaintiff received accommodations for the Spring 1990, Fall 1990 and Spring 1991 examination periods as well. The law school accommodations included time-and-a-half to take examinations, the use of a yellow legal pad with a red left margin instead of the traditional "blue book," and permission to circle the answers on multiple choice examinations instead of filling in a computer-scored answer sheet. Plaintiff's grade point averages after receipt of the accommodations were: Fall 1989—2.58; Spring 1990—2.50; Fall 1990—1.82[2]; Spring 1991—2.90.

Plaintiff graduated from Vermont Law School in May 1991, with a cumulative grade point average of 2.32, and a class standing of 143 out of 153 students.

### D. *Plaintiff's Relevant Employment History*[3]

Except for periods during which she was preparing for the bar examinations or moving from one job to another, plaintiff has been continuously employed since graduating from law school. Upon graduating from law school, plaintiff worked at a New York law firm until December 1992, when her

---

**2.** At trial, plaintiff explained that during this semester she had spent a great deal of time traveling to, and caring for, an ill parent.

**3.** The Court adds this section as its own finding of facts from testimony adduced at trial.

firm dismissed her because she failed the Bar Examination for the third time. In January of 1993 and until June of 1993, she worked with a client of her former law firm on a special project until its completion. After a number of months of unemployment during which time she could not find work in the legal profession, in September of 1993, plaintiff became a director of a day care center in Brooklyn, New York. In July of 1994, plaintiff returned to her former profession of educational administration, and is currently employed as an Associate Professor of Educational Administration at Dowling College. She receives accommodations at work for her reading problems in the form of a full-time work-study student who assists her in reading and writing tasks. While working at the law firm, plaintiff predominantly self-accommodated her disability (*e.g.,* dictating instead of writing reports, not billing for the additional time it took her to complete tasks), although she was given a computer before other associates because of her writing difficulties.

### E. *Plaintiff's Bar Exam Applications*

Plaintiff took the Multistate Professional Responsibility Examination ("MPRE") in 1991 and received accommodations, including extra time, for that examination. The MPRE is not administered by the Board. In June 1991, fewer than 45 days before the examination, plaintiff applied, and requested accommodations, for the July 1991 Bar Examination.

Submitted with plaintiff's application was a Psychoeducational Evaluation from Philip M. Massad, Ph.D., a clinical psychologist, which indicated that he evaluated plaintiff on November 30, 1989 and December 7, 1989. In his evaluation, Dr. Massad concluded that plaintiff has "dyslexia characterized by a deficit in phonological processing (DSM–III–R 315.00)." (Pl.'s Ex. 20a, at 5, Massad's Psychoeducational Evaluation.)

On July 1, 1991, James Fuller, the Executive Secretary to the Board, advised plaintiff that because she had missed the deadline for applying for accommodations, her request was denied. Fuller further indicated that the Board did not consider the materials she had submitted as current, and that the scores she earned in 1989 on the Woodcock test—the test utilized by the Board to screen reading disabled applicants—did not qualify plaintiff for accommodations. Fuller based his conclusion on the fact that the Woodcock Word Attack and Word Identification scores on plaintiff's test were above the 30th percentile. Dr. Frank R. Vellutino, a research psychologist retained by the Board to advise it on policies relating to learning disabled applicants, had previously indicated to the Board and Fuller that scores above the 30th percentile generally did not identify an applicant as having a significant reading disability. (Fuller Aff. ¶ 52.) [4] Vellutino, however, did not review plaintiff's application at this time.

Plaintiff failed the July 1991 Bar Examination with a score of 563 (a passing score is 660).

In November 1991, plaintiff applied for the February 1992 New York State Bar Examination. Plaintiff did not request accommodations for this test. Plaintiff took and failed the February 1992 Bar Examination with a score of 580.

In June 1992, plaintiff applied for the July 1992 Bar Examination. The parties dispute whether plaintiff applied for accommodations for this test. Plaintiff claims she did, but the Board has no record of the request. Plaintiff was not accommodated for the test, which she took and failed with a score of 576.

In January 1993, plaintiff applied for the February 1993 Bar Examination, again requesting accommodations for her learning disabilities. The accommodations sought by plaintiff were unlimited/extended time to take the test, and permission to tape record her essays and to circle her multiple choice answers in the test booklet.

Submitted with plaintiff's request for accommodations was Dr. Massad's 1989 Psychoeducational Evaluation, previously sub-

---

**4.** Witnesses gave their direct testimony at trial by way of an affidavit. "Aff." refers to the affidavit of direct testimony of the named individual.

mitted by plaintiff, and a November 20, 1992 letter from Dr. Massad to plaintiff reasserting the opinion he set forth in his 1989 Evaluation.

Upon receipt of this application, Fuller referred the file to Dr. Vellutino. After evaluating the materials submitted to him, Dr. Vellutino recommended that plaintiff's request for accommodations be denied. Based on Dr. Massad's 1989 evaluation and his 1992 letter, Dr. Vellutino concluded that there was "no compelling documentation" of a learning disability and that the reading test data did not support a diagnosis of dyslexia.

By letter dated January 20, 1993, Fuller forwarded the documentation relating to plaintiff and Dr. Vellutino's recommendation to the Board. The Board denied plaintiff's request for accommodations. In a letter dated January 26, 1993, Fuller advised plaintiff that the documentation she had submitted was insufficient to establish a basis for granting the accommodations requested.

Plaintiff appealed the Board's decision denying her accommodations in a letter received by the Board on February 17, 1993. Plaintiff did not submit any additional documentation concerning her learning disability with the appeal. By letter dated February 18, 1993, Fuller advised plaintiff that her appeal was untimely. Fuller also advised plaintiff that following consultation with an expert in the field, the Board had determined that the documentation that plaintiff had provided did not support the finding of a disability warranting accommodations.

Plaintiff took and failed the February 1993 Bar Examination with a score of 615.

In May 1993, plaintiff applied for the July 1993 Bar Examination, again requesting accommodations. On plaintiff's application, plaintiff identified her disability as "learning disabilities—DSM III-R 315.00." Plaintiff obtained a new evaluation from a clinical psychologist, Dr. Richard F. Heath. Plaintiff requested the following accommodations: extra time, use of a word processor or permission to dictate essay responses, and leave to circle answers on the multiple choice questions examination sheet. Fuller referred this application to Dr. Vellutino.

Dr. Vellutino again recommended that plaintiff's request for accommodations be denied, affirming his original opinion that plaintiff did not have a reading disability. By letter dated June 29, 1993, the Board advised plaintiff that the test profiles she had provided did not support a diagnosis of dyslexia, and therefore, her request for accommodations was denied.

By letter dated July 12, 1993 from Jo Anne Simon, Esq. to Fuller, plaintiff submitted her application for reconsideration. Plaintiff included the following with her appeal: an affidavit by Stephanie J. Wilbanks, Associate Dean for Academic Affairs at Vermont Law School, attesting to the fact that plaintiff was provided accommodations during her final two years at law school; Dr. Massad's and Dr. Heath's Evaluations; a copy of a letter from Paul A. Cullinan, Ph.D., Chair of the Educational Administration Department at New York University, stating that plaintiff had received accommodations at New York University; and a notice from the Pennsylvania Bar Examiners advising plaintiff that she had been granted accommodations for the July 1993 Pennsylvania Bar Examination. Dr. Heath also submitted a letter to the Board, dated July 3, 1993, wherein he reaffirmed his earlier evaluation and recommendation for accommodations.

Dr. Vellutino reviewed the file and again concluded that plaintiff's scores as reported by Dr. Massad and Dr. Heath supported his earlier opinion that there was insufficient documentation to support a finding of a learning disability. Fuller so notified plaintiff on July 19, 1993.

This litigation was commenced on July 20, 1993.

Pursuant to a Stipulation dated July 26, 1993 and so ordered by this Court, the parties agreed that plaintiff would receive accommodations during the July Bar Examination pending the outcome of this litigation. The Board gave plaintiff time-and-a-half—a period of nine hours—for the New York portion of the test and the use of an amanuensis to read the test questions to plaintiff and record her responses. In addition, the Board allowed plaintiff to mark the answers to the

multiple choice portion of the examination in the question book rather than on the computerized answer sheet. Plaintiff elected to take the MBE in Pennsylvania.

Pursuant to the terms of the Stipulation, if plaintiff passed the July 1993 New York State Bar Examination with accommodations, the results were not to be certified to the Court of Appeals unless she was successful in this litigation.

Despite accommodation, plaintiff failed the July 1993 Bar Examination with a score of 597. At trial, plaintiff claimed the accommodations granted to her for this test were inadequate because she had had insufficient time to rest between the New York and Pennsylvania Bar Examinations or to practice with her amanuensis, an accommodation she had never previously used. She also complained that the proctor placed in her room caused distracting noises during the test.

### F. *Other Bar Examinations*

In July 1993, plaintiff took the Pennsylvania Bar Examination and MBE with accommodations. The Pennsylvania Bar Examiners allowed plaintiff to mark her answers directly in the question booklet, gave her a separate room to take the test, granted her time-and-a-half—the maximum allowable time—and authorized her to use an amanuensis.

Plaintiff did not pass the Pennsylvania Bar Examination despite the accommodations.

### G. *Overview of the Applications Submitted to the Board for Accommodations*

In February 1992, the Board administered the Bar Examination to 2,231 applicants. Among the applicants, 71 requested accommodations; 65 were granted, 4 were denied and 2 requested accommodations but either did not apply for the February 1992 Bar Examination or withdrew. Of the 71 applicants, 13 requested accommodations on the basis of a learning disability; 10 requests were granted and 3 were denied.

In July 1992, the Board administered the Bar Examination to 7,436 applicants. Of the applicants, 152 requested accommodations; 127 were granted, 7 were denied, 10 did not apply for the July 1992 Bar Examination or withdrew, one applicant passed the previous Bar Examination on appeal, 6 applicants did not provide additional documentation requested, and one applicant changed location due to a medical reason. Of the 152 applicants, 26 requested accommodations on the basis of a learning disability or attention deficit disorder; 21 requests were granted and 5 were denied.

In February 1993, the Board administered the Bar Examination to 2,202 applicants. Among the applicants, 102 requested accommodations; 88 were granted, 8 were denied, 1 did not qualify, 4 did not apply for the February 1993 Bar Examination or withdrew, and one applicant passed the previous Bar Examination on appeal. Of the 102 applicants, 19 requested accommodations on the basis of a learning disability or attention deficit disorder; 16 requests were granted and 3 were denied.

In July 1993, the Board administered the Bar Examination to 7,373 applicants. Of the applicants, 181 requested accommodations; 155 requests were granted, 16 were denied and 10 applicants did not respond to a request for additional information. Of the 181 applicants, 51 requested accommodations of the basis of a learning disability or attention deficit disorder; 37 requests were granted and 14 were denied.

## II. ADDITIONAL FACTS

Based on the testimony presented and the exhibits admitted during the bench trial, my additional factual findings pursuant to Fed. R.Civ.P. 52 are as follows:

### A. *Plaintiff's Psychoeducational Evaluations*

The evaluations of plaintiff by her three psychologists, all of whom testified at trial, can be summarized as follows.

1. PHILLIP M. MASSAD, Ph.D. (Examination in December 1989)

*a) test results*

Wechsler Adult Intelligence Scale—Revised ("WAIS")

| | |
|---|---|
| Verbal IQ: | 126 |
| Performance IQ: | 109 |
| Full Scale IQ: | 122 |

Mean = 100, Standard Deviation = 15

| Verbal Scale | | Performance Scale | |
|---|---|---|---|
| Information | 15 | Picture Completion | 15 |
| Digit Span | 10 | Picture Arrangement | 11 |
| Similarities | 16 | Block Design | 11 |
| Arithmetic | 11 | Object Assembly | 10 |
| Vocabulary | 15 | Digit Symbol | 10 |
| Comprehension | 16 | | |

Mean = 10, Standard Deviation = 3

Woodcock Reading Mastery Test—Revised, Form H

| Subtest | Percentile Rank (by age) |
|---|---|
| Word Attack | 67th |
| Word Identification | 52nd |
| Word Comprehension | 98th |
| Passage Comprehension | 97th |
| Overall Reading Cluster | 90th |
| Reading Comp. Cluster | 97th |
| Basic Skills Cluster | 64th |

Wide Range Achievement Test—Revised ("WRAT")

| Subtest | Percentile Rank (by age) |
|---|---|
| Spelling | 34th |
| Arithmetic | 63rd |

Rey Osterreith Complex Figures Test

| Subtest | Percentile Rank (by age) |
|---|---|
| Immediate Recall | 35th |
| Delayed Recall | 65th |

*b) clinical observations*

Dr. Massad administered four tests for which he reported no scores: the Detroit Tests of Learning Aptitude, a test of visual memory with which he reported plaintiff "had difficulty"; the Bender Gestalt Visual Motor Test about which he made no comment; the Minnesota Multiphasic Personality Inventory from which he found no evidence of undue test anxiety or other psychopathology; and the Gray Test of Oral Reading—Revised (the "Gray"). (Dr. Massad's Psychoeducational Evaluation is at Pl.'s Ex. 20a.)

Of particular significance is the Gray, because it is a test on which the subject reads aloud from a passage and reading speed is measured. It is untimed, meaning the test taker is under no time constraints to complete the reading assignment. Questions are then asked to assess reading comprehension. Dr. Massad testified that he had plaintiff read aloud from the test passage to "get a feel" for plaintiff's reading rate. (Tr. at 222.)[5] He did not score the result, and made no mention of it in his six-page Psychoeducational Evaluation because it is not

5. As noted at the outset of this opinion, the trial transcript and exhibits are voluminous. Many of the witnesses at trial repeated themselves at various times. The Court is only citing, as deemed appropriate, to one place in the record where an issue is discussed. Citations to the trial transcript are made with the designation "Tr." followed by the relevant page number(s).

normed for adults and because he did not remember that its findings were "significant or germane to the diagnoses or what I was trying to determine." (*Id.*) "I didn't see anything remarkable to report." (Tr. at 224.) Dr. Massad administered no other test that evaluated plaintiff's reading speed, nor did he draw any conclusions with regard to whether plaintiff was a slow reader. (Tr. at 206, 208.)

Based on his examination, Dr. Massad testified at trial that "it is my professional opinion that the plaintiff has learning disabilities characterized by difficulties with automaticity, phonological processing, organizing and processing visual-spacial information, short term memory and sequential processing and will require accommodations on the New York State Bar Examination." (Massad Aff. ¶ 79.) Dr. Massad, however, did not discuss plaintiff's automaticity problems in the evaluation he submitted to the Board. (Tr. at 233.) He defines automaticity as the "ability to not have to deliberate when decoding a word." (*Id.*).

Dr. Massad agrees with the definition of learning disabilities contained in the Diagnostic and Statistical Manual III–R.[6] Based on this definition, Dr. Massad believes that learning disabilities are characterized and identified by "intraindividual" variability in test performance scores. (Massad Aff. ¶ 42.) He views plaintiff's disabilities as reflected in the variability exhibited by plaintiff's subtest scores on the Passage and Reading Comprehension WAIS subtests as compared to her Word Attack and Word Identification scores, and as between her verbal IQ and her spelling score on the WRAT. He further finds that plaintiff "had difficulty organizing and processing visual-spatial information" as evidenced by her score on the Block Design and Object Assembly subtests, and her Rey–Osterreith score. Dr. Massad also concludes that plaintiff's reading skills were below what would be expected of a subject with plaintiff's record of academic achievement and intelligence. (Massad Aff. ¶ 81.)

2. RICHARD F. HEATH, Ph.D. (Examination in May 1993)

*a) test results*

Woodcock Reading Mastery Test—Revised (The "Woodcock")

| (grade) * | Form G<br>% ile<br>(age) | Form H<br>% ile<br>(age) | G & H<br>% ile<br>(age) | G & H<br>% ile |
|---|---|---|---|---|
| Visual–Auditory Learning | 46 | | | |
| Letter Identification | 18 | | | |
| Word Identification | 37 | 52 | 45 | 35 |
| Word Attack | 28 | 50 | 37 | 26 |
| Word Comprehension | 76 | 90 | 84 | 73 |
| Passage Comprehension | 74 | 99 | 88 | 90 |
| Readiness Cluster | 28 | | | |
| Basic Skills Cluster | 36 | 53 | 43 | 25 |
| Reading Comp. Cluster | 78 | 98 | 89 | 85 |
| Total Reading Cluster | 48 | 84 | 66 | |

* The Woodcock is normed up to grade 16.9, *i.e.*, college graduates. Plaintiff's percentile rank thus represents the proportion of college graduates in a demographically representative sample who scored below her on the test.

6. The DSM–III–R definition reads, in pertinent part:

> Developmental Reading Disorder. The essential feature of this disorder is marked impairment in the development of word recognition skills and reading comprehension that is not explainable by mental retardation or inadequate schooling and that is not due to visual or hearing defect or a neurologic disorder. The diagnosis is made only if this impairment significantly interferes with academic achievement or with the activities of daily living that require reading skills. Oral reading is characterized by omissions, distortions, and substitutions of words and by slow, halting reading. Reading comprehension is also affected. This disorder has been referred to as "dyslexia."

(Pl.'s Ex. 99.)

The definition was revised in the latest version of the manual, the DSM–IV:

### b) clinical observations

Dr. Heath, a clinician with an extensive background in diagnosing learning disabilities in adults, did not purport to diagnose plaintiff in his evaluation to the Board, but only to confirm Dr. Massad's diagnosis and supply plaintiff with the Woodcock scores requested by the Board. (Pl.'s Ex. 16, Heath's Psychoeducational Evaluation; Heath Aff. ¶ 52; Tr. at 505–06.) In his evaluation, however, Dr. Heath described plaintiff as a "dyslexic adult" in his evaluation. (Pl.'s Ex. 16, Heath's Psychoeducational Evaluation, at 2.) Moreover, he noted in his evaluation that "Dr. Bartlett decoded words slowly and without automaticity; self-corrections were common." (*Id.* at 1.) Further, in describing her reading tests, he noted that "[s]he read [ ] passages slowly, and she typically read the more complex passages two or three times in order to ascertain their meaning." (*Id.* at 2.)

In his trial affidavit, Dr. Heath described his observations more fully:

58. In administering the Woodcock to plaintiff, I observed several things which are relevant to and supportive of my opinion that the plaintiff has learning disability. First, I noticed that she had to make several attempts to sound out words which should have been second nature to her. She [sic] reading was full of hesitations, and self corrections. In other words, plaintiff will attempt to read a word such as "instigator" as "investigator." Since she will hear that it sounds incorrect she will start over and often corrects her reading of the word after several attempts. On the Woodcock, this would be credited as a correct response, even though it took her three attempts to get it right and took more time than it would have taken a person who did not have to read in this fashion.

59. Second, I observed that she needs to use her finger to keep her place when reading a paragraph in the passage com-

prehension subtest. The paragraphs on this subtest are only three to five lines long and yet plaintiff has difficulty keeping her place when reading.

60. Third, I observed that plaintiff reads aloud in a hesitant manner, slowly and without automaticity. Automaticity is the phenomenon by which a person recognizes a printed word and is able to read it accurately, and immediately; in other words, automatically and without thinking. In particular, plaintiff had a great deal of difficulty reading polysyllabic words, vowels (especially diphthongs, digraphs and in ascertaining differences between long and short vowels), consonant blends and silent consonant conventions.

61. Fourth, I also observed that on the more complex reading passages, Dr. Bartlett typically read the passages over two or three times before she could respond to that test item. She uses contextual cues to facilitate her decoding. She reads very slowly. She will reread a phrase or sentence to make sure she gets it. You can often see her lips move or hear her read quietly to herself and when she does this, you can hear the mispronunciations. When she is faced with an unfamiliar polysyllabic word she is very slow to break down the word to different parts and she will mispronounce parts of the word. She is slow to synthesize the morphemes into a word.

In his trial affidavit, Dr. Heath also opined that the results of the Woodcock test he administered were consistent with Dr. Massad's diagnosis:

As I mentioned earlier, I observed the plaintiff needed to sound out words slowly and with repeated attempts. This pattern of word attack is indicative of someone whose decoding skills are not fully formed. Word attack skills are generally well formed by junior high school age. Plaintiffs scaled are on the Word Attack subtest

The essential feature of reading disorder is reading achievement (i.e. reading accuracy, speed or comprehension as measured by individually administered tests) that falls substantially below that expected given the individual's chronological age, measured intelligence and age-appropriate education. (Pl.'s Ex. aa.)

form G was 91, 28th percentile with a grade equivalent of 4.7. Thus, in laymen's terms plaintiff decodes pseudo-words at a fourth grade level. This is a strikingly different performance from what one would expect of a person whose Passage Comprehension score on the same form of the test (G) was 110 or the 74th percentile. (Heath Aff. ¶ 62.)

Dr. Heath further described plaintiff as suffering from a "mild to moderate" reading disability. (Tr. at 507.) Dr. Heath utilizes the same diagnostic approach as Dr. Massad, viewing a learning disability as "intraindividual or intrinsic to the nature of the individual." (Heath Aff. ¶ 47.) [7] Dr. Heath uses a history, neuropsychological battery, intelligence tests and achievement tests to diagnose learning disability. He looks for variation between the verbal and performance IQ scores on the WAIS, discrepancies between timed and untimed subtests, and errors in subtests. (Heath Aff. ¶ 40.)

In the evaluation he submitted to the Board, Dr. Heath identified the difference between plaintiff's Basic Skills Cluster score and Reading Comprehension Cluster score as consistent with dyslexia:

> [Bartlett's] pattern of decoding errors, as well as the significant discrepancy between her basic reading skills (43rd percentile) and reading comprehension (89th percentile), are consistent with a language-based learning disability.

(Pl.'s Ex. 16, Heath's Psychoeducational Evaluation, at 2.) At trial, he also maintained that any discrepancy between IQ and achievement scores over 1.5 standard deviations was strong evidence of a learning disability. (Heath Aff. ¶ 71.)

3. ROSA A. HAGIN, Ph.D. (Examination in September 1994)

*a) test results*

Woodcock Reading Mastery Test—Revised

| | Form G<br>% ile<br>(age) | Form H<br>% ile<br>(age) |
|---|---|---|
| Word Attack | 50 | 50 |

Diagnostic Reading Test ("DRT") *

| | Form C (timed) | Form A (untimed) |
|---|---|---|
| Comprehension | 50th % ile | 98th % ile |
| Speed | 4th % ile (195 wpm) | >1st % ile (156 wpm) |

* The DRT is not age normed. The highest grade norm is college freshmen, and thus plaintiff's score is ranked against that group.

Wide Range Achievement Test

| | % ile<br>(age) |
|---|---|

---

7. Dr. Heath prefers the definition of learning disabilities adopted by the National Joint Committee on Learning Disabilities ("NJCLD"), which reads:

> Learning disabilities is a general term that refers to a heterogeneous group of disorders manifested by significant difficulties in the acquisition and use of listening, speaking, reading, writing, reasoning, or mathematical abilities. These disorders are intrinsic to the individual, presumed to be due to central nervous system dysfunction, and may occur across the life span. Problems in self-regulatory behaviors, social perception, and social interaction may exist with learning disabilities but do not by themselves constitute a learning disability. Although learning disabilities may occur concomitantly with other handicapping conditions (for example, sensory impairment, mental retardation, serious emotional disturbance) or with extrinsic influences (such as cultural differences, insufficient or inappropriate instruction), they are not the result of those conditions or influences.

(Pl.'s Ex. 96, Donald D. Hammill, *On Definind Learning Disabilities: An Emerging Consensus*, 23 J. Of Learning Disabilities 74, 77 (1990) (quoting 1988 NJCLD 1).)

| | |
|---|---|
| Oral Reading | 86 |
| Spelling | 45 |

## Neuropsychological Battery

| | |
|---|---|
| Bender Gestalt Visual Motor Test: | 2/9 figures recalled |
| Phoenician Spelling Test (spelling nonsense words): | 19/20 correct |
| Trailmaking Test: | Speed abnormally low, poor visual scanning |
| Purdue Pegboard: | Normal speed, but poor laterality |
| Extension Test: | Equivocal laterality |
| Finger Gnosis: | 4/7 errors, most on left; poor laterality |
| Directionality | 5/7 errors in directional orientation |

### b) clinical observations

Dr. Hagin has been among the nation's leading researchers in the field of learning disability for more than two decades and is the author of many books and articles on the subject. She holds faculty appointments at Fordham University and in the Department of Psychiatry at New York University Medical Center, and supervises clinics at both institutions. She examined plaintiff in preparation for trial and served as her lead expert witness.

Dr. Hagin opined, based on Drs. Massad's and Heath's evaluations and her own, that plaintiff "has a learning disability consistent with the National Joint Committee on Learning Disabilities definition." (Pl.'s Ex. 93, Hagin's Psychological Evaluation, at 3; *see* definition *supra*, note 7.) Dr. Hagin placed considerable emphasis on the DRT results, which she viewed as demonstrating plaintiff's slow rate of reading. She also based her opinion on: (a) the 17–point discrepancy between plaintiff's WAIS verbal and performance scores, which Dr. Hagin asserted occurs in less than 20% of the population; (b) neuropsychological findings suggesting "central nervous system dysfunction"; (c) variations of 1½ standard deviations or more among WRMT subtest scores and WAIS subtest scores; (d) an 18–point discrepancy between the verbal IQ score and the Word Attack scores, which Dr. Hagin asserted occurs in 5% of the population; (e) plaintiff's performance on a 53–word writing sample,

which was "laborious" and contained five spelling errors, and (f) achievement test scores that, overall, contrast with plaintiff's superior cognitive abilities and academic achievement. (Pl.'s Ex. 93, Hagin's Psychological Evaluation at 3.)

Of central importance in her diagnosis is Dr. Hagin's view that plaintiff has evolved a set of personal skills to compensate for her disability:

> She used several kinds of cues to assist her in responding to the tasks presented: slowing down the rate of response, verbal rehearsal of rote sequencing items, pointing cues to assist in keeping her place on visual text.

(Pl.'s Ex. 93, at 2.) Dr. Hagin believed that plaintiff's earlier work as a school teacher where phonics were stressed allowed plaintiff to develop "self-accommodations" that account for her ability to spell better and to perform better on word identity and word attack tests than would be expected of a reading disabled person.

According to Dr. Hagin, a learning disability's diagnosis cannot be made "on the basis of any one score or any one test. It made [sic] based on a total picture." (Hagin Aff. ¶ 110.). For this reason, she prefers the NJCLD definition of learning disability.[8] Although many of plaintiff's achievement scores fell in the average range when compared with plaintiff's age group, Dr. Hagin's judgment is that "one's educational level and

---

8. *See* note 7, *supra*.

expectancy" and clinical judgment should be dispositive in identifying a learning disability rather than test scores based on age norms. "Clearly, graduation from law school denotes a high level of achievement and correlated expectancies." (Hagin Aff. ¶ 123.)

Dr. Hagin believes that Dr. Vellutino's definition of dyslexia as solely a phonological decoding problem is too narrow. (Tr. at 698.) She views the reading task as more complex than simply identifying words. The reading process also requires understanding what text means. (Tr. at 695–96.) To Dr. Hagin, because the Woodcock tests relied upon by Dr. Vellutino do not test automaticity or reading rate, they are poor indicators of a decoding problem in individuals like plaintiff who function at higher cognitive levels. (Tr. at 699–703.) Dr. Hagin notes that the DRT is a "very easy test"—comparable to reading a passage in *Reader's Digest.* Dr. Hagin expects a college-educated person to read DRT passages at the rate of 300 words-per-minute. Instead, plaintiff read at 195 words-per-minute timed—the fourth percentile compared to college freshman, and 156 words-per-minute untimed—below the first percentile compared to college freshman. (Tr. at 435, 701, 1050–51, 1092.) According to Dr. Hagin, plaintiff should have been performing at the 50th percentile of college freshmen, and instead reads very slowly when compared to a college student. (Tr. at 1050–51.)

For Dr. Hagin, the issue is not whether plaintiff can comprehend as she reads but the difficulty plaintiff has in the process of comprehending what she reads. (Tr. at 1076, 1632.) Dr. Hagin concludes that plaintiff does not read in the same condition, manner or duration of the average adult reader in that plaintiff does not read with the automaticity or speed of an average reader. (Tr. at 2494–98, 2545.)

### 4. Plaintiff's In–Court Demonstration

As part of plaintiff's proof, Dr. Hagin administered an in-court demonstration of plaintiff's reading and writing ability. Plaintiff was asked to read a passage describing a criminal law hypothetical from a 1988 bar exam, a document selected at random by the Court from among the exhibits, consisting of 426 words. Plaintiff read haltingly and laboriously, whispering and sounding out some words more than once under her breath before she spoke them aloud. Plaintiff marked the right-hand side of the text with her right index finger, advancing it down the right margin and using her left hand to read across the line. (Tr. at 748.) She made one word identification error, reading the word "indicted" as "indicated." Plaintiff's reading speed was approximately 40 words per minute.

Plaintiff was also asked to write a 48–word passage as it was dictated to her. The specimen produced, Plaintiff's Exhibit 174, has six grammar and spelling errors ("families" for "family's," "prapar" for "prepare," "Dave" for "David," "brotha" for "brother," "inaddvertently" for "inadvertently" and "omited" for "omitted"), and three words crossed out at the right margin which appear to have been written backwards or in "mirror writing." It took plaintiff approximately 10 minutes to complete the task.

Another specimen of plaintiff's handwritten work product admitted into evidence was her essay answers on the February 1993 New York Bar Examination, consisting of 38 single-spaced pages. (Pl.'s Ex. 185; Def.'s Ex. B.) Omitting what are commonly understood shorthand condensations of words (*e.g.,* "managemt" for "management,"), I count 10 spelling errors. There are no examples of mirror writing, and the handwriting is generally legible. Plaintiff completed all six of the essay questions.

The Court recognizes that the trial setting undoubtedly affected plaintiff's performance in the courtroom demonstration. Therefore, the Court places limited value on the demonstration. The Court instead relies upon Dr. Hagin's and Dr. Heath's testimony of what they saw during their evaluation of the plaintiff and uses the demonstration only as illustrative of some of the phenomena Dr. Hagin and Dr. Heath described during their testimony.

### B. *Defendants' Expert Opinions*

### 1. FRANK R. VELLUTINO, Ph.D.

At all relevant times, the Board employed a research psychologist expert in the field of

learning disabilities, Dr. Frank R. Vellutino, to advise it on policies relating to the identification and accommodation of learning disabled applicants, and to screen applications for accommodations. Dr. Vellutino is a leading researcher in the field of learning disabilities and has published numerous books and articles on the subject. His primary experience is with children. He is a Professor in the departments of Linguistics, Psychology and Educational Psychology and Statistics at the State University of New York at Albany. He also supervises a clinic engaged in the identification and treatment of children with dyslexia.

In its rules and regulations, the Board does not specify what tests, if any, applicants for accommodations should submit with their applications.[9] Dr. Vellutino prefers to receive scores from each of the Woodcock Reading Mastery Test—Revised Word Attack and Word Identification subtests in evaluating applicants claiming a reading disability. The Board advises applicants of Dr. Vellutino's preferences if they call or write asking which test results they should submit. Even if an application does not provide results from the Woodcock test, Dr. Vellutino will examine the results from whatever tests are submitted and evaluate whether those test results contain a word identification/word attack component sufficient to support the clinician's conclusions.

The Woodcock Word Attack test requires a subject to sound out nonsense words and is thus a test of a person's ability correctly to associate letter combinations with their sounds, a task referred to as phonological decoding ability. A subject is presented with 45 separate words, beginning with simple one-syllable patterns (e.g., "ip" and "din") and progressing to more complex combinations (e.g., "ceisminadolt" and "gnouthe"). The Woodcock Word Identification test requires a subject to identify 106 real words in isolation that range from simple ("is") to difficult ("zymolysis"). Both tests are untimed, and the scores do not reflect incorrect tries that precede a correct answer.

Dr. Vellutino discounts the significance of discrepancies in test scores as an identifier or discriminator for learning disabilities in an individual because even superior readers have discrepancies in scores. (Tr. at 1787–88 (noting that IQ/Achievement discrepancies are present in both good and poor readers); Vellutino Aff. ¶ 14 (stating that discrepancy reported in Dr. Bartlett's scores is contrary to that found in reading disabled applicants because she has higher score in verbal skills than performance skills).) Similarly, Dr. Vellutino claims that research studies demonstrate that problems with spelling do not define a learning disabled person because "there are many good readers who are also poor spellers." (Vellutino Aff. ¶ 14.) Neither do visual spatial organization problems, directional confusion or the like identify a reading disabled individual for Dr. Vellutino. (Tr. at 1173 (reporting that "in every piece of research we've done ... we get no differences between poor and normal readers" in performing these tasks); id. at 1200 (stating he does not believe that Dr. Hagin's tests are "important diagnostic signs").)

Dr. Hagin concurs with Dr. Vellutino that a discrepancy in scores or difficulty in other visual or spatial functions do not identify a learning disabled individual, but she believes that the discrepancies and task malfunctions can signal the existence of a disability. (Hagin Aff. ¶¶ 116, 126.) In Dr. Bartlett's case, as discussed, Dr. Hagin notes that plaintiff performed poorly on directional task tests; further, Dr. Hagin clinically observed the effect of such confusion upon plaintiff's reading in plaintiff's use of her finger to track left to right reading, and in plaintiff's frequent skipping of a line when returning to the right side of the page. (Tr. at 748–49.)

According to Dr. Vellutino, directional reading confusion exists in both learning disabled and nonlearning disabled children, and many adults retain vestiges of childhood coping mechanisms for reading difficulties. (Tr. at 1849–50.) Because the signals relied upon by Dr. Hagin are not, according to him, discriminators of learning disability, Dr. Vellutino believes that a diagnosis of dyslexia can only "be based exclusively on measures of reading ability, in particular measures of

---

**9.** See note 33, infra.

Word Identification and phonetic decoding or word analysis skills (ability to 'sound out' a word), deficiencies in which are characteristic of individuals with severe reading disability." (Vellutino Aff. ¶ 33(a).) The only tests available which measure these functions are the Woodcock Reading Mastery Test—Revised or the Woodcock–Johnson Psychoeducational Test Battery. (Id. ¶ 33(c).) Dr. Vellutino prefers the Woodcock Reading Mastery Test over the Woodcock Johnson because the Mastery Test is more comprehensive. (Id.) Moreover, Dr. Vellutino believes the Word Attack subtest, is the most "direct measure of phonological dyslexia." (Tr. at 1804.)

Based on his view that a reading disability must affect an applicant's ability to perform on reading function tests like word attack and word identification, Dr. Vellutino recommended to the Board that it automatically grant accommodations to applicants claiming reading disabilities if their scores on the Woodcock Word Attack and Word Identification tests are below the 30th percentile when age-normed or grade-normed. (Vellutino Aff. ¶ 33(e); Tr. at 2058 (defining "significantly impaired in reading" as "deficiency in reading subskills").) Dr. Vellutino recommended the 30th percentile cutoff on the basis of studies showing that the incidence of learning disability in the population is estimated at between 5% and 20% and thus, a 30% cutoff, according to him, would be reasonably certain to capture all disabled applicants. (Vellutino Aff. ¶ 32; see also Tr. at 1305–06 (describing his choice of a 30th percentile cut-off as arbitrary, but not irrational because the cut-off is overinclusive).) Dr. Vellutino admits that scores on the Woodcock, and hence his cut-off, do not distinguish reading disabled applicants who read slowly from purely slow readers. (Tr. at 2401–02.)

Dr. Vellutino, however, will give applicants the benefit of doubt and has recommended accommodations for an applicant if either their Word Attack or Word Identification score is below 30% or 1 or 2 percentage points above, or other subset reading scores show marked deviations from the average range or are marginal. (See, e.g., Pl.'s Ex. 123–A68; Tr. at 2080–84, 2089, 2094, and 2123.)

Plaintiff scored in the 29th percentile on the Word attack test given by Dr. Heath but Dr. Vellutino did not give her the benefit of the doubt or recommend accommodations for her because he considered. that one score an anomaly among other test scores that demonstrated above average, if not superior, reading functions. Moreover, he viewed that score as within an average range. (Tr. at 1303–05, 2118–19, 2167.) Dr. Vellutino also discounted Dr. Hagin's characterization of plaintiff as a slow reader because he viewed plaintiff's performance at the rate of 195 words-per-minute on the DRT test as within average range. (Vellutino Aff. ¶ 62; Tr. at 1212–15.) In reaching this conclusion, Dr. Vellutino relied upon various studies of reading rates and extrapolated from them that plaintiff's DRT was within the normal range, despite the 4% untimed college norm and 1% timed college norm of the test. (Tr. at 1822.) Finally, Dr. Vellutino assumes that anyone who can score above the 30th percentile in Forms G and H of the Woodcock has sufficient automaticity to read most texts. (Tr. at 2405.) In short, Dr. Vellutino recommended against giving Dr. Bartlett accommodations because he has "rarely" seen clinical findings of a significant disability with such high test scores. (Tr. at 1314; but see Pl.'s Ex. 123–18; Tr. at 2161 (applicant with scores much like plaintiffs who Dr. Vellutino recommended for accommodation).)

## 2. DR. JACK M. FLETCHER

Dr. Fletcher holds professorships at the University of Texas Medical School at Houston and the University of Houston. He is a psychologist and holds a diplomate in neuropsychology. He has published widely on dyslexia and neuropsychology, and devotes half of his time to clinical practice, principally, but not exclusively, with children.

Earlier in his career, Dr. Fletcher wrote articles criticizing Dr. Vellutino's approach to the diagnosis of learning disabilities. (Fletcher Aff. ¶ 9.) However, based on his own research and that of others, Dr. Fletcher has concluded that Vellutino's approach is the only valid approach for identifying a learning disability. (Id. ("Over the years, Dr. Vellutino's original hypotheses concern-

ing the cognitive basis of reading disability have been shown to be correct. His early hypotheses presaged the now widely accepted understanding that reading disabilities have a linguistic basis and specifically reflect fundamental problems with the development of word decoding abilities that, in turn, reflect deficiencies in the acquisition of phonological awareness skills.").) After examining plaintiff's evaluation reports, he concluded that plaintiff was neither impaired nor disabled. (Fletcher Aff. ¶ 11.) He concurred fully with Dr. Vellutino's evaluation of plaintiff's application for accommodations. (Fletcher Aff. ¶ 47.)

### C. *Plaintiff's evidence of disability.*

#### 1. *Psychometric Testing.*

The experts in this case disagreed on much, but none challenged the efficacy of psychometric testing *per se.* Plaintiff's experts use the same cluster of achievement tests as defendants' experts to assess the presence of a reading disability. These tests have been standard in the psychology discipline for decades. The tests have gained acceptance in the field in part because statistical measures of their reliability are positive.[10] Plaintiff's experts mention, as a general proposition, that test scores alone can not reliably identify reading disabled individuals, and they criticize Dr. Vellutino's reliance on the Woodcock for identifying adults with a reading disability. I agree with plaintiff's experts.

Plaintiff's experts have persuaded me that plaintiff's reading disability cannot be measured solely by psychometric testing. For example, no test measures automaticity directly. (Tr. 489, 503, 702.) A lack of auto-

maticity in understanding words without undue attention to them is usually inferred from a combination of test scores and clinical observations. (Tr. at 701–02.) In this case, all three of plaintiff's experts noted plaintiff's stark lack of automaticity when she was required to read aloud. On the Woodcock tests themselves, plaintiff had to sound out the words repeatedly before coming to an answer. Plaintiff's lack of automaticity is further confirmed by her slow rate of reading compared to college freshmen on the DRT test. In that test, plaintiff's timed reading rate of 195 wpm compared to the 4% percentile of college freshmen. Finally, plaintiff's reading test data was not consistent across a wide range of reading-related skills. As noted by Dr. Heath and Dr. Hagin, plaintiff's high comprehension scores were incongruent with her relatively lower Word Attack and Word Identification scores.

I find seriously infirm Drs. Vellutino and Fletcher's presumption (albeit according to them rebuttable presumption) that a score above the 30th percentile on the Woodcock Word Attack and Word Identification subtests in all cases identifies the absence of a reading disability. As admitted by Dr. Vellutino, such a screening mechanism suffers from serious problems where an applicant's other scores and clinical reports place him or her at or below the average on other reading skill indicators. (*See, e.g.,* Tr. at 2107). Further, the best evidence for the Woodcock's shortcomings comes from defendants' experts and the scientific evidence upon which they rely.

To support their testimony, both Drs. Vellutino and Fletcher relied principally on the studies of adult dyslexics conducted by Dr.

---

**10.** For the Woodcock, median split-half reliability coefficients (using the Spearman–Brown formula) range from .84 to .98. (Pl.'s Ex. 183 at 912.) The Tenth Mental Measurements Yearbook, a guide viewed by plaintiff's lead expert, Dr. Hagin, as authoritative, (Tr. at 551), concludes:

[t]he Woodcock Reading Mastery Tests—Revised is a reliable instrument useful in measuring *some aspects* of the reading process. Used in conjunction with the more valid process-oriented measures, the WRMT–R can potentially contribute to a thorough review of a subject's reading growth.

(Pl.'s Ex. 183 at 913) (emphasis added). *But see,* Pl.'s Ex. 183 at 916 (A second reviewer concluded that the diagnostic value of the WRMT—R is "debatable" and that "evidence offered in support of the reliability and validity ... must be judged inadequate.") The percentile rankings derived from the scores, however, are accurate to within plus or minus 5 points. (*Id.*) The fact that plaintiff was tested on both Forms G and H increases the statistical reliability of the scores.

For the Wide Range Achievement Test—Revised, all the subtests administered to plaintiff have a reliability of .91 or better as determined by test-retest measures. (*Id.* at 902.)

Maggie Bruck. (Tr. at 280, 1780.) Yet, Bruck found the Woodcock subtests poor discriminators for a learning disability unless the subject's reaction time was measured. (Defs.' Ex. JJ at 444; Pl.'s Ex. 149 at 262 ("[I]t is the slowness of reading that is particularly characteristic of the deficient word recognition skills of adult Dyslexics").) The Woodcock is an untimed measure of phonological decoding ability and does not score for reaction time. Further, both Dr. Fletcher and Dr. Vellutino do not credit clinical reports of lack of automaticity. Yet, Dr. Vellutino did acknowledge the Woodcock's weakness with regard to discriminating for lack of automaticity. (Tr. at 2305.)

A second criticism of the tests is that they are designed principally to test children and thus do not have enough items in the difficult range. Dr. Vellutino, in a recent research article, acknowledged the Woodcock has "severe limitations," in that "there are far too few items at any given level to be certain of reliability at that level." (Pl.'s Ex. 89 at 304 Vellutino, Scanlon & Tanzman, *Components of Reading Ability* (1994).) Further, although Form G and H are supposed to be equivalent tests for norms, Dr. Vellutino admits that in his clinical experience Form G is harder than Form H. (Tr. at 1955.) Dr. Fletcher does not use these tests in his research.

Moreover, although Dr. Vellutino claims the 30th percentile cutoff is "over inclusive," Bruck reported that, using a test similar to the Woodcock, "one third of the subjects [adult Dyslexics] scored above the 30th percentile on the WRAT–R Level II." (Defs.' Ex. KK at 877.) In an earlier study of college-student dyslexics, the average score was at the 32nd percentile, with the range being from the 3rd to 81st. (Defs. Ex. JJ, Table 1, at 443.) Thus, despite Dr. Vellutino's insistence that the 30th percentile cut-off is over generous in identifying reading disabled applicants, the studies he relies upon provide testing data that show reading disabled college students performing well above the 30th percentile. Bruck reports that using a test similar to the Woodcock, "one third of the [adult dyslexics] subjects scored above the 30th percentile on the WRAT–R Level

II." (Def. Ex. KK at 877). In an earlier study of college-student dyslexics, the average score was at the 32nd percentile, with the range being from the 33rd to 81st percentiles. (Def. Ex. JJ, Table 1, at 443).

Finally, I do not credit Dr. Vellutino's attempt to equate Bartlett's low DRT reading rate score with an average rate by extrapolation to other tests. This approach is seriously infirm in that it attempts to compare scores on different tests with different subject populations. As noted by Dr. Hagin, to be within the average range of college freshmen, plaintiff should have been performing at the 50th percentile of the DRT, and instead she reads at a very slow rate for the college student population which this test directly measures. (Tr. at 1050–51.)

In short, I do not accept Dr. Vellutino and Dr. Fletcher's conclusions that reading disabled individuals are incapable of having the test scores reflected by plaintiff. Plaintiff's experts have convinced me that a reading disability is not quantifiable merely in test scores. A learning disability is not measurable in the same way a blood disease can be measured in a serum test. By its very nature, diagnosing a learning disability requires clinical judgment. Clinicians need to examine a patient to ensure that low or disparate scores are not the result of low intelligence, or emotional or other social problems. Moreover, I accept the opinion of plaintiff's experts, based on the studies of Dr. Maggie Bruck, that tests like the Woodcock are "poor discriminators" for adults. (Defs.' Exh. JJ at 444.) Thus, as much as the Board would like to find an easy test discriminator for a reading disability in its applicants, such a test does not exist. Finally, I also do not accept the position of defendants' experts that clinical judgments of a lack of automaticity must be rejected as subjective. Clearly, plaintiff's low, albeit within the average range, test scores on the Woodcock, combined with clinical observations of her manner of reading amply support a conclusion that she has an automaticity and a reading rate problem.

2. *Discrepancy versus performance measures*

Central to this case has been the contention by plaintiff's experts that reading

disability can be identified by significant variations (one standard deviation or more) between either (i) intelligence (or aptitude) measures versus reading performance (or achievement) measures or (ii) within the discrete subskills comprising intelligence or within those comprising reading ability. This theory, commonly called the discrepancy theory, has engendered considerable controversy in the psychology profession.[11]

■ As applied to this case, the plaintiff's experts did not agree on a uniform measure of discrepancy and this fact undermined the discrepancy theory's validity. Dr. Massad defined it as a discrepancy between verbal IQ and decoding scores on the Woodcock, (Pl.'s Ex. 20(a), Massad's Psychoeducational Evaluation, at 5), or, in the alternative, between subtest scores on the Verbal Scale. (Tr. at 219.) Dr. Heath maintained that the most probative discrepancy measure was the differential between plaintiff's basic reading skills (the 43rd percentile) and her reading comprehension (89th percentile). (Pl.'s Ex. 16, Heath's Psychoeducational Evaluation, at 2.) Dr. Hagin testified that she uses the widest differential between an intelligence score and reading achievement scores. (Tr. at 1105 ("I think the expectancy estimate should be the most optimistic estimate.").) Perhaps even more confusingly, at the same that defendants' expert, Dr. Vellutino, strongly criticizes the discrepancy theory, he avows an adherence to a definition of dyslexia that appears to approve explicitly the discrepancy theory. Specifically, Dr. Vellutino subscribes to the following "research definition" of dyslexia promulgated by the Orton Dyslexia Society:

> Dyslexia is one of several distinct learning disabilities. It is a specific language-based disorder of constitutional origin characterized by difficulties in single word decoding, usually reflecting insufficient phonological processing abilities. *These difficulties in single word decoding are often unexpected in relation to age and other cognitive and academic abilities,* they are not the result of generalized developmental disability or sensory impairment. Dyslexia is manifested by variable difficulty with different forms of language, often including, in addition to problems reading, a conspicuous problem with acquiring proficiency in writing and spelling.

(Pl.'s Ex. 94.) (emphasis added).

A standard that adopts a purely self-referential measure of an impairment's severity, however, is fraught with danger as it is likely to be both under and over inclusive.[12] In assessing reading disability, individuals with very high IQ scores but average reading ability will be found disabled, although their reading skills may be less developed because of any number of factors other than the presence of a disorder:

**11.** "Today, the value of these discrepancy formulas is one of the most hotly disputed issues in the field of learning disabilities." (Pl.'s Ex. 96 at 77 Donald D. Hammill *On Defining Learning Disabilities: An Emerging Consensus,* 23 *J. Learning Disabilities* 73, 77 (Feb.1990).)

Notwithstanding its contested basis, federal regulation and many states have adopted the discrepancy definition pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* IDEA lists learning disabilities as among those covered, 20 U.S.C. § 1401(a)(1)(A), the regulations define a learning disabled child as one who "does not achieve commensurate with his or her age and ability level" and "has a severe discrepancy between achievement and intellectual ability in ... [among other things] basic reading skill." 34 C.F.R. § 300.543. New York's definition tracks the federal rule, but quantifies "severe" as "a discrepancy of 50% or more between expected achievement and actual achievement ..." 8 NYCRR § 200.1(6). Forty-five states have adopted some form of the discrepancy definitions. (Pl.'s Ex. 168 at 149.)

The only case in this circuit to reach the issue of a disputed diagnosis of learning disability under IDEA found for defendants on the grounds that plaintiff's "overall scores on psychological tests ... ranged from average to below average," *Hiller v. Bd. of Educ. of Brunswick Cent. Sch. Dist.,* 743 F.Supp. 958, 975 (N.D.N.Y.1990), and that Dr. Vellutino's expert opinion in the case was more credible that plaintiff's experts. *Id.* at 971 n. 50.

**12.** *But see In re Petition of Rubenstein,* 637 A.2d at 1133 (crediting discrepancy definition as basis for diagnosis of learning disability); *Pazer v. New York State Bd. of Law Examiners,* 849 F.Supp. at 287 (finding "some merit" to discrepancy theory but ruling for defendants on grounds that Dr. Vellutino's opinion and average to superior test scores refuted plaintiff's claim that he had a learning disability).

All persons have some mental or physical deviations from the norm. However, such inherent limitations or deviations from the norm do not automatically constitute handicaps.

*American Motors Corp. v. Labor and Indus. Review Comm'n,* 119 Wis.2d 706, 350 N.W.2d 120, 123–24 (1984). Under inclusion would result from a methodology which excluded individuals whose IQ and reading scores were both below the norm, but not widely enough apart to trigger statistical significance. As will be discussed, *infra,* the Rehabilitation Act presumes resort to an extrinsic average to define disability, and I believe Congress intended to adopt such a standard in defining disability under the ADA.[13]

I do not need, however, to decide whether the discrepancy theory is scientifically valid. I accept Dr. Hagin's position that deviations or discrepancies in test scores should only be used as an indication that a learning disability exists. They do not, standing alone, identify a learning disabled person. Clinical judgment, including the elimination of other potential causative factors, must then be used to identify a learning disability. I accept Dr. Vellutino's proposition that the absence of a statistical correlation between deviations in test scores and a learning disability makes them an inappropriate diagnostic discriminator. Nevertheless, this does not *a fortiori* mean that deviations are not helpful in identifying a learning disability. It simply means that tests score deviations do not, standing alone, *identify a learning disabled person.* Because a learning disability is not susceptible to metric testing, clinical judgment must be used to identify whether the deviation in a particular case reflects the existence of a learning disability.

### *CONCLUSIONS OF LAW*

I adopt herein any Finding of Fact previously set forth which might more properly be deemed a Conclusion of Law.

**13.** In the EEOC's interpretive guidance to its regulations promulgated under Title I, it explained that:

An individual is not substantially limited in a major life activity if the limitation, when viewed in light of the factors noted above, does not amount to a significant restriction when compared with the abilities of the average person. For example, an individual who had once been able to walk at an extraordinary speed would not be substantially limited in the major life activity of walking if, as a result of a physical impairment, he or she were only able to walk at an average speed, or even at a moderately below averages speed.

29 C.F.R. Pt. 1630, App. Section 1630.2(j).

## I. PLAINTIFF'S ADA AND REHABILITATION ACT CLAIMS

As noted previously, the threshold issue in any claim brought pursuant to the ADA or Section 504—and therefore the underlying determination upon which all of plaintiff's claims, both statutory and constitutional, are based—is the determination whether the claimant is substantially impaired, and hence disabled, as defined by the law. *See Flight v. Gloeckler,* 68 F.3d 61 (2d Cir.1995); *Argen v. New York State Bd. of Law Exam'rs,* 860 F.Supp. 84, 86 (W.D.N.Y. 1994); *Pazer v. New York State Bd. of Law Exam'rs,* 849 F.Supp. 284, 287 (S.D.N.Y. 1994). The burden of proof, of course, is on plaintiff and it is satisfied by the preponderance of the evidence. *See Borkowski v. Valley School District,* 63 F.3d 131, 145–48 (2d Cir.1995) (discussing plaintiff's burden of preponderance of the evidence) (Newman, C.J., concurring).

### A. *Background: The ADA and Section 504*

The ADA and Section 504 of the Rehabilitation Act define disability with nearly identical language.

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (Supp.1995) (ADA); *see* 29 U.S.C. § 706(8)(B) (Supp.1996) (Rehabilitation Act, as amended). By enacting the ADA, Congress explicitly intended to expand

upon the foundation laid by the earlier enacted Rehabilitation Act:

> The first purpose is to make applicable the prohibition against discrimination on the basis of disability, currently set out in regulations implementing section 504 of the Rehabilitation Act of 1973, to all programs, activities, and services provided or made available by state and local government or instrumentalities or agencies thereto, regardless of whether or not such entities receive Federal financial assistance.

H.R. 101–485(II), 101st Cong. (1990), *reprinted in* 1990 4 U.S.C.C.A.N. 303, 366. The ADA's legislative history contains many references to judicial opinions construing Section 504. *See, e.g., id.* at 354 (citing *Stutts v. Freeman,* 694 F.2d 666 (11th Cir.1983)). I thus conclude that Congress intended courts .construing the ADA to use relevant precedent developed under the Rehabilitation Act. As will be discussed, cases defining substantial impairment in the employment context are particularly useful in determining the elements of the substantiality test generally.

Plaintiff claims the following are "major life activities" in which she is impaired: learning, reading, writing, studying, test-taking and, alternatively, working. (Pl.'s Post–Trial Mem. at 5, 9.)

■ The regulations promulgated under Title II of the ADA define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 28 C.F.R. § 35.104(1)(iii)(2) (1991).[14] More instructive are the regulations promulgated under Title I by the Equal Employment Opportunities Commission ("EEOC") which define major life activities as "those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. Pt. 1630, App.. § 1630.2(i) (1991). By this standard, which I accept, all of plaintiff's proposed activities qualify as major life activities. Only test-taking could arguably not be "basic." But in the modern era, where test-taking begins in the first grade, and standardized tests are a regular and often life-altering occurrence thereafter, both in school and at work, I find test-taking is within the ambit of "major life activity."

■ The Rehabilitation Act covers a "specific learning disability." 29 U.S.C. § 706(15)(A)(iii) (1996 Supp.). Congress explicitly intended that learning be considered a major life activity and that learning disabilities be covered under the ADA as well. *See, e.g.* H.R. 101–485(II), 101st Cong. (1990), *reprinted in* 1990 4 U.S.C.C.A.N. 303, 333–34 ("A ... mental impairment means ... any ... psychological disorder, such as ... specific learning disabilities." "A 'major life activity' means [inter alia] ... learning ...."). The ADA's regulations track this language. *See* 28 C.F.R. § 35.104(1)(i)(B) (as to public entities, a mental impairment means "[a]ny mental or psychological disorder ..., and specific learning disabilities"); 29 C.F.R. § 1630.2(h)(2) (as to private employers, same). The experts who testified at trial agreed that reading is the major life activity most commonly affected by learning disabilities, with reading disabilities accounting for approximately 70–80% of all those diagnosed as learning disabled. (Fletcher Aff. ¶ 12.) Clearly reading is a major life activity, as other courts have found. *See, e.g., Pridemore v. Rural Legal ·Aid Society,* 625 F.Supp. 1180, 1183–84 (S.D.Ohio 1985). Writing is also indisputably a major life activity.

For purposes of this case, plaintiff's claimed disability collapses into an inability to read like the average person on tests like the bar examination, for that is the skill that plaintiff claims constricts her ability to engage in all the other relevant major life activities. Also, and in the alternative, I will address plaintiff's contention that she is substantially impaired in the major life activity of working. The EEOC regulations provide the following definition for substantial limitation in the major life activity of working:

> With respect to the major life activity of working—

---

14. The ADA is divided into five titles: Title I addresses discrimination by private employers; Title II by public entities; Title III in public accommodations and services operated by private entities; Title IV in telecommunications; and Title V contains miscellaneous provisions.

(i) The Term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the *average person having comparable training, skills and abilities.* The inability to perform a single, particular job, does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i) (emphasis added).

### B. *Application of the Statutes to Defendants*

Defendants do not contest that Titles II and III of the ADA apply to them. Title II reads:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

Further, the Department of Justice was charged with enacting regulations under Title II, which read, in pertinent part:

A public entity may not administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability.

28 C.F.R. § 35.130(b)(6) (1991).[15]

■ Defendants argue, however, as a predicate matter, that they are beyond the reach of the Rehabilitation Act, which applies only to recipients of federal funds. Section 504 of the Rehabilitation Act provides:

No otherwise qualified individual with a disability ... shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a) (1996 Supp.).

The Board argues it is merely a conduit for crediting back to the state federal funds it receives for the benefit of disabled applicants. These funds are monies the state receives to pay the bar application fee of disabled applicants that are credited to the Board and then deposited by the Board in the State's general fund. According to the statute itself, however, any of the following receiving federal funds are covered by the Rehabilitation Act:

(b) 'Program or activity' defined

For the purposes of this section, the term 'program or activity' means all of the operations of—

(1)(A) a department, agency, special purpose district, or other instrumentality of a State or local government; or

(B) the entity or such State or local government that *distributes such assistance and each such department or agency* (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State of local government.

29 U.S.C. § 794(b)(1) (emphasis added).

There is no dispute that the Board is a creature of the State. Defendants argue, however, that there is an insufficient nexus between them and the federal funds because the Board lacks the discretion to use the money. Nevertheless, the relevant issue is whether the State or the Board have the discretion under State law to refuse the federal funds altogether. *See Grove City College v. Bell,* 465 U.S. 555, 575, 104 S.Ct. 1211, 1222, 79 L.Ed.2d 516 (1984) (holding that "indirect" receipt of federal funds, such as student loans, still qualifies as federal funding for purposes of Title IX; the school had discretion to discontinue accepting such federal funding to be freed from Title IX's dictates). Because the Board and the State could refuse the federal programs that require them to accept payment of an applicant's fee from the federal government, by electing to accept the money, both the Board and the State consented to place the Board under the burdens of Section 504. What the

---

**15.** For a further discussion of Title II and Title III in the context of employment exams such as the bar examination, *see* part F., *infra.*

State permits the Board to do with the money after the Board receives it is irrelevant.

With this understood, I move to consider plaintiff's claims under both the Rehabilitation Act and the ADA. Before I do so, however, I must address another predicate question which plaintiff proposes defines the burden of proof in establishing whether she is, in fact, disabled.

## C. *The Treating Physician Rule*

Plaintiff first proposes that the Court apply to ADA cases the "treating physician rule" adopted by this Circuit in *Schisler v. Heckler,* 787 F.2d 76 (2d Cir.1986), as modified by *Schisler v. Bowen,* 851 F.2d 43 (2d Cir.1988). The pertinent language plaintiff relies upon states as follows:

[A]treating·physician's opinion on the subject of a medical disability, *i.e.,* diagnosis and nature and degree of impairment, is: (i) binding on the factfinder unless contradicted by substantial evidence; and (ii) entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians.

*Schisler,* 787 F.2d at 81.

Since this standard was adopted, the Department of Health and Human Services has promulgated its own rule, under which:

[HHS gives] more weight to opinions from [plaintiffs] treating sources, since these sources are more likely to be the medical professionals most able to provide a detailed, longitudinal picture of [plaintiffs] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

As applied to this case, plaintiff maintains that the Board should have given more weight to the opinions of the two psychologists whose reports plaintiff submitted with her application for accommodations as compared to Dr. Vellutino's because (1) Dr. Vellutino never examined the plaintiff, and (2) her psychologists (a) used well-supported ac-

ceptable clinical diagnostic techniques, (b) were consistent, and (c) were well qualified, all factors the HHS rule and the Second Circuit cases consider.· For the same reasons, plaintiff proffers Dr. Hagin's testimony as more weighty than that of either Dr. Vellutino or Dr. Fletcher. I cannot agree that such a presumption should be automatically applied by either the Board or this Court.

· The treating physician rule, in all its incarnations, is premised upon the existence of an ongoing therapeutic relationship between an applicant and a treating physician. HHS' regulation identifies a "treating physician" differently than "individual examinations, such as consultative examinations" of the type plaintiff's psychologists supplied. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). No ongoing relationship of substantial duration existed between plaintiff and her psychologists. For this reason, plaintiff's reliance upon *D'Amico* to support the use of a treating physician rule as a presumption in cases such as this one is misplaced. In *D'Amico,* the court chose, not as a presumption, but as an evidentiary matter, to give deference to a treating doctor based on a 20–year treatment relationship between the plaintiff and the doctor who reported upon her condition. *See D'Amico,* 813 F.Supp. at 222. Such a relationship does not exist here.

Moreover, in the treating physician cases cited by plaintiff, there is no fundamental difference of scientific opinion as to the very definition and testing criteria necessary to identify a disabling condition. Rather, it is the applicability of well-settled medical standards to particular patients that is at issue in the cases upon which plaintiff relies. Here, science has yet to yield either a definitive understanding of the etiology of learning disability or a consensus as to the best means of measuring or identifying it.

In short, whatever benefit the· treating physician rule might have in social security disability cases, it is inappropriate to apply it· as a presumption in ADA cases of this type. To the extent the Board may choose to avoid liability for an erroneous determination that a particular applicant is not disabled, the rule

may have some advantages.[16] A court may also, in the context of particular cases, choose, as an evidentiary matter, to give extra weight to an appropriate treating physician, but there is no basis in law to apply the presumption plaintiff seeks to all cases of this type.

### D. Substantial Limitation Under the Law

#### 1. Determining the Appropriate Demographic Group for Comparison: Is the Practice of Law a Sufficiently Broad Category of Jobs

As noted at the outset, the core issue to be decided in this case is whether plaintiff suffers a disability that "substantially limits" a major life activity within the meaning of the ADA. Because "substantially limits" is a necessarily amorphous concept, the Court must look to the regulations promulgated by the EEOC and to relevant case law to define its precise contours.

As to most major life activities, such as reading and learning, the EEOC's regulations, promulgated under Title I of the ADA, define the concept as follows:

1. The term substantially limits means:

 (i) unable to perform a major life activity that the average person in the general population can perform; or

 (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (emphasis added).[17]

However, the EEOC regulations define substantial limitation in the major life activity of working differently:

With respect to the major life activity of working—

 (i) The Term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job, does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i) (emphasis added). As can be seen, the pivotal difference between the test for substantial impairment in most major life activities and the test for substantial impairment in the major life activity of working is the appropriate demographic group to whom the plaintiff will be compared. With respect to most major life activities, the plaintiff is compared to "the average person in the general population." 29 C.F.R. § 1630.2(j)(1). Therefore, to determine whether plaintiff is substantially impaired in her reading, learning, or even test-taking, I must decide whether, when compared to the average person in the general population, plaintiff is substantially limited in these major life activities.

However, when I consider whether plaintiff is substantially limited in the major life activity of working, an entirely different reference group must be utilized. No longer is plaintiff compared to the "average person in the general population." Instead, the relevant comparison group is "the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). This becomes a crucial distinction in a case such as this one, where plaintiff's history of self-accommodation has allowed her to achieve great accomplishments, one of which includes roughly average reading skills (on some measures) when compared to the general population.

---

16. For a discussion of how other bar examiners and some law schools evaluate learning disability applications, *see* note 33, *infra.*

17. The commentary notes:
 Determining whether a physical or mental impairment exists is only the first step in determining whether or not an individual is disabled. Many impairments do not impact on an individual's life to the degree that they constitute disabling impairments.
 29 C.F.R. § 1630. App. § 1630.2(j).

When plaintiff is compared to persons of "comparable training, skills, and abilities," however, a completely different evaluation of plaintiff's abilities emerges. All of her tremendous accomplishments through self-accommodation to the side, when compared to this population, plaintiff does not read like the average college student — much less the average law school student. When compared to this population, her reading skills (which when compared to the general population are barely average) are well below normal.

There is an important caveat to this analysis, however. As the regulation regarding the major life activity of working provides, "[t]he inability to perform a single, particular job, does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Rather, plaintiff must be "significantly restricted in the ability to perform either a *class* of jobs or a *broad range* of jobs in various classes...."*Id.* (emphasis added). The question then turns to whether plaintiff's attempt to compete in the bar examination as do other qualified candidates implicates an ability or inability "to perform either a class of jobs or a broad range of jobs in various classes." *Id.*

Foremost, there is no question that fairly competing in the bar examination — thus making it possible that one could at least potentially pass the examination — is a precondition to practicing as a lawyer.[18] Just as obvious is the fact that plaintiff is not entitled to an accommodation which will ensure that she actually *passes* the bar examination. Rather, the accommodation is given so that she might be able to compete on a level playing field with other applicants taking the bar examination.

■ If plaintiff's disability prevents her from competing on a level playing field with other bar examination applicants, then her disability has implicated the major life activity of working because if she is not given a chance to compete fairly on what is essentially an employment test, she is necessarily precluded from potential employment in that field. In this sense, the bar examination

clearly implicates the major life activity of working. Without the successful passing of the bar examination that can only come after one has been given a fair opportunity to compete on the examination, an individual may be able to involve themselves in a narrow range of law-related activities, such as being a law school professor or a legal consultant. However, without a fair chance to compete for admission to the bar, a law school graduate is effectively excluded from performing "a class of jobs," most specifically, lawyering, including providing legal advice or performing all of the functions that comprise the essence of being a lawyer. Therefore, plaintiff's inability to read and take the bar examination as do other law school graduates has the effect of impeding her entry into a "class of jobs," as that concept is understood under the ADA. *Cf. Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 626, 104 S.Ct. 1248, 1250, 79 L.Ed.2d 568 (1984) (noting that "[a]mong [the Rehabilitation Act's] purposes are 'to promote and expand employment opportunities in the public and private sectors for handicapped individuals and place such individuals in employment.'").

I conclude that plaintiff's exclusion is much greater than an exclusion from "a single, particular job." 29 C.F.R. § 1630.2(j)(3)(i). She is excluded from performing any and all jobs that comprise the "class of jobs" known as the practice of law. Again, the interpretative regulations of the ADA promulgated by the EEOC are instructive on this point. They provide three additional factors that may be considered when determining whether there is a substantial limitation in the major life activity of working:

(ii) In addition to the factors listed in paragraph (j)(2) of this section, the following factors may be considered in determining whether an individual is substantially limited in the major life activity of working.

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowl-

**18.** *See* discussion of employment tests, part F., *infra.*

edge, sills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii).[19] The first of these factors, the geographical area to which the individual has reasonable access, is somewhat irrelevant to this discussion because plaintiff's inability to compete on a level playing field for admission to the bar could potentially exclude her practice of law anywhere in the country. While she is only applying for admission to the New York State Bar, a large geographic area in and of itself, her inability to gain bar admission will also result in her inability to be admitted *pro hac vice* in other jurisdictions. Therefore, regardless of the range of plaintiff's reasonable geographic access, she is impeded from participating in the profession for which she labored for three years in law school. *See E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088, 1101 (D.Hawai'i 1980) ("If an individual were disqualified from the same or similar jobs offered by employers throughout the area to which he [or she] had reasonable access, then his [or her] impairment or perceived impairment would have to be considered as resulting in a substantial handicap to employment.").

The next factor mentioned in the regulation suggests that a court examine "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(B). This

is a crucial factor weighing in favor of a finding of plaintiff's substantial impairment. Her inability to read as well as the average law student—and her accompanying impairment in attempting to become bar-admitted—disqualifies plaintiff from a whole host of jobs which utilize the training, knowledge, skills or abilities of a law school graduate. Consider the number and types of jobs involving the practice of law in New York City alone, much less in the broader geographical market to which plaintiff has reasonable access. All of these countless jobs and opportunities are foreclosed to plaintiff as long as her failure to pass the bar examination is affected by the Board's refusal to accommodate her learning disability. While it may be said that plaintiff can utilize her law degree in other ways by becoming a law professor or legal consultant, the fact of the matter is that this small category of jobs represents a very small subset of the much broader class of jobs from which plaintiff is excluded by her inability to compete fairly and hence to have an opportunity to gain admission to the bar. *See Black,* 497 F.Supp. at 1101 (providing that a plaintiff's "own job expectations and training must be taken into account" in considering category of jobs from which plaintiff is excluded); *id.* at 1101–02 ("Certainly, if an applicant were disqualified from an entire field, there would be a substantial handicap to employment. But, questions as to subfields and the like must be answered on a case-by-case basis, . . . .").

The final factor to be considered under the EEOC regulations is "the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(C). The number and types of jobs that fall into this category are quite small, because plaintiff has not alleged that she is excluded from a "broad

19. The interpretative guidelines attached to the EEOC regulations provide that:

The terms "number and types of jobs" and "number and types of other jobs" as used in the factors . . . are not intended to require an onerous evidentiary showing. Rather, the terms only require the presentation of evidence

of general employment demographics and/or of recognized occupational classifications that indicate the approximate number of jobs (e.g., "few," "many," "most") from which an individual would be excluded because of an impairment.

29 C.F.R. Pt. 1630, App. Section 1630.2(j).

range of jobs in various classes." *Id.*[20] Rather, she has alleged that she is excluded from one specific class of jobs: the practice of law. In sum, having considered these factors, I find that plaintiff is substantially limited in the major life activity of working because her inability to be accommodated on the bar examination—and her accompanying impediment to becoming bar-admitted—exclude her from a "class of jobs" under the ADA.

In promulgating these regulations, the EEOC attached (as an "Interpretive Guidance") a lengthy elucidation of the meaning of the regulations. On the question of the substantiality of an impairment in the major life activity of working, the EEOC wrote:

> [A]n individual is not substantially limited in working just because he or she is unable to perform a particular job *for one employer,* or because he or she in unable to perform a specialized job or profession requiring extraordinary skill, prowess or talent. For example, an individual who cannot be a commercial airline pilot because of a minor vision impairment, but who can be a commercial airline co-pilot or a pilot for a courier service, would not be substantially limited in the major life activity of working. Nor would a professional baseball pitcher who develops a bad elbow and can no longer throw a baseball be considered substantially limited in the major life activity of working. In both of these examples, the individuals are not substantially limited in the ability to perform any other major life activity and, with regard to the major life activity of working, are only unable to perform either a particular specialized job or a narrow range of jobs. *See Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986); *Jasa-*

*ny v. U.S. Postal Service,* 755 F.2d 1244 (6th Cir.1985); *E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088 (D.Hawai'i 1980).

29 C.F.R. Pt. 1630, App. Section 1630.2(j) (emphasis added). This interpretive guidance from the EEOC, and the examples it provides, lend further support to my finding that plaintiff has been substantially limited in the major life activity of working by her exclusion from the opportunity to participate in the "class of jobs" designated as the practice of law.

First, as previously noted, plaintiff is not excluded merely from "a particular job for one employer," *id;* rather, she is excluded from thousands of jobs by hundreds of employers. Furthermore, I cannot find under these regulations that the practice of law is "a specialized job or profession requiring extraordinary skill, prowess or talent." *Id.* Particularly in light of the example given— that of a baseball player with a bad elbow—I do not find that the regulation was intended to classify the practice of law as a specialized profession. If it were, then every profession would be considered a specialized profession, because each contains its own "extraordinary skill, prowess, or talent." If such were to be the interpretation of the regulation, then many Americans with disabilities would be wholesale excluded from many of the most prominent, lucrative, and rewarding occupations known as "professions" —— such as doctoring, lawyering, and accounting. In light of the commentary given, I find the EEOC's language is not designed to apply to generalized professions but is designed to prevent challenges brought by a person who is dissatisfied because some impairment pre-

---

**20.** As the EEOC interpretive guidance explains this factor, it looks to those individuals who are not excluded from any one class of jobs because of their impairment, but rather are excluded from a broad range of jobs in various classes because of their impairment. The EEOC writes:

> [A]n individual does not have to be totally unable to work in order to be considered substantially limited in the major life activity of working.... For example, an individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to

perform a class of jobs. This would be so even if the individual were able to perform jobs in another class, e.g., the class of semi-skilled jobs. Similarly, suppose an individual has an allergy to a substance found in most high rise office buildings, but seldom found elsewhere, that makes breathing extremely difficult. Since this individual would be substantially limited in the ability to perform the broad range of jobs in various classes that are conducted in high rise office buildings within the geographical area to which he or she has reasonable access, he or she would be substantially limited in working.

29 C.F.R. Pt. 1630, App. Section 1630.2(j).

vents him or her from being a qualified individual for a highly specialized job, such as that of a professional athlete.[21]

Case law, while somewhat murky in this area, is also instructive on the question whether the practice of law is a sufficiently broad category of jobs.

In *E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088 (D.Hawai'i 1980),[22] one of the first published cases to address the question of what constitutes a substantial impairment in the context of the major life activity of working, the United States District Court in Hawaii reviewed the determination of an Administrative Law Judge ("the ALJ") that plaintiff's back condition—while an impairment—did not *substantially* impair his ability to work because it did not affect his "employment generally." The ALJ held that plaintiff must "demonstrate that the impairment ... impeded activities relevant to many or most jobs." *Id.* at 1094. The Hawaii district court reversed the ALJ's ruling, stating that the ALJ's test regarding "employment generally" was invalid. The Court explained that "this type of definition drastically reduces the coverage of the Act, and undercuts the purposes for which the Act was intended." *Id.* at 1099. The Court went on to explain:

> A person, for example, who has obtained a graduate degree in chemistry, and is then turned down for a chemist's job because of an impairment, is not likely to be heartened by the news that he can still be a streetcar conductor, an attorney or a forest ranger. A person who is disqualified from employment in his chosen field has a substantial handicap to employment, and is substantially limited in one of his major life activities.

*Id.* Clearly, the same sorts of concerns that motivated the district court's ruling in *Black* are present here. Plaintiff struggled through three laborious years of law school—at no small fiscal or psychic cost. To tell her now that she is free to go and practice another profession, or to return to her prior field of education, would not be consistent with the remedial goals that Congress intended in passing the ADA.

Numerous courts have likewise held that in determining whether a plaintiff's impairment is substantial in the major life activity of working, the proper scope of inquiry is to the relevant employment at issue—not to employment generally or more broadly construed. *See, e.g., Cook v. State of Rhode Island, Dep't of Mental Health, Retardation, and Hospitals,* 10 F.3d 17, 25 (1st Cir.1993) (upholding jury's finding that "plaintiff's limitations foreclosed a broad range of employment options in the health care industry"—plaintiff's chosen field); *Welsh v. City of Tulsa,* 977 F.2d 1415, 1419 (10th Cir.1992) (where plaintiff held degree in safety and failed to achieve position as firefighter because of numbness in his fingers, court specifically notes that plaintiff "did not show that his degree in Safety qualified him solely for the position of firefighter"); *id.* (also noting that plaintiff's "assumption that other fire departments would also misapply standards regarding employment of firefighters so as to disqualify him is only speculation. [Plaintiff] failed to present evidence like [a] vocational expert's opinion that the plaintiff would be precluded from performing not only the specific job for which she applied, but a wide range of jobs...."); *Taylor v. United States Postal Service,* 946 F.2d 1214, 1217 (6th Cir.1991) (noting with approval *Black*'s conclusion that plaintiff "would be substantially limited in obtaining his career goal"); *Forrisi v. Bowen,* 794 F.2d 931, 934 (4th Cir.1986) (requiring that plaintiff show that the impairment "foreclose *generally the type of employment involved*") (emphasis added); *id.* (noting that plaintiff " 'had no difficulty in obtaining other jobs *in his field*' ") (emphasis

---

**21.** For an excellent example of what the EEOC intended to prevent with the "specialized profession" language, *see* discussion of *Jasany v. United States Postal Service,* 755 F.2d 1244, 1249 (6th Cir.1985), part E., *infra.*

**22.** *Black* has been relied upon by numerous courts as "the most comprehensive examination

by a court to date" of the standards for finding disability under the ADA and the Rehabilitation Act. *See, e.g., Jasany v. United States Postal Service,* 755 F.2d 1244 (6th Cir.1985); *Padilla v. City of Topeka,* 238 Kan. 218, 708 P.2d 543, 549–50 (Kan.1985).

added); *id.* (adding that "[f]ar from being regarded as having a 'substantial limitation' in employability, Forrisi was seen as unsuited for one position in one plant——and nothing more."); *Gupton v. Virginia,* 14 F.3d 203, 205 (4th Cir.) (plaintiff had to show that her allergy "foreclosed generally her opportunity to obtain *the type of employment involved* ") (citing *Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986)) (emphasis added) (citations and internal quotations omitted), *cert. denied,* 513 U.S. 810, 115 S.Ct. 59, 130 L.Ed.2d 17 (1994); *id.* (describing prior holding that no disability is found where plaintiff "had shown no difficulty in obtaining other jobs *in his field* ") (citations and internal quotations omitted) (emphasis added); *id.* at 206 n. 4 (citing cases and explaining that plaintiffs in them were not foreclosed generally from "obtaining jobs doing *the type of work plaintiff has chosen as his field.*") (emphasis added); *Padilla v. City of Topeka,* 238 Kan. 218, 225, 708 P.2d 543 (Kan.1985) (endorsing *Black* 's rejection of "employment generally" test). *See also Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 384 (2d Cir.1996) (citing cases); *Heilweil v. Mt. Sinai Hospital,* 32 F.3d 718, 723 (2d Cir.1994) ("An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one."); *id.* at 723–24 (citing cases); *id.* at 724 ("Nothing suggests plaintiff's education and previous job experiences would hinder her ability to find a suitable position in the general field of administration"——plaintiff's chosen career.); *Daley v. Koch,* 892 F.2d 212, 215 (2d Cir.1989) (plaintiff's impairment excluded him only from *particular position* of police officer) (emphasis added). *But see Byrne v. Board of Educ.,* 979 F.2d 560, 565 (7th Cir.1992) (*misquoting Black* as providing that "an ability to perform a particular job for a particular employer is not sufficient to establish a handicap; the impairment must substantially limit employment generally.").

Second Circuit precedent likewise acknowledges that the appropriate focus is not plaintiff's exclusion from employment generally, but instead is something more than exclusion from a particular job with a particular employer. *See Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379 (2d Cir.1996) (providing that "[i]f a jury reasonably could have found that Wernick needed work environment modifications in order to perform *any* job, and that therefore she was disabled, it was error for the district court to hold that, as a matter of law, she was not disabled. If, however, the only reasonable conclusion a jury could have reached was that Wernick needed the accommodations solely to perform her *current* job, the district court correctly granted summary judgement in favor of [the defendant] on the ground that Wernick was not disabled, because, as we held in Heilweil, '[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.' ") (emphasis added); *Heilweil v. Mt. Sinai Hospital,* 32 F.3d 718, 723 (2d Cir.1994) (stating that when determining whether a plaintiff's physical impairment substantially limits her ability to work, "the kinds of jobs from which the impaired individual is disqualified must be carefully considered. An impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.") (citing *Jasany, supra*), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); *id.* at 723–24 ("In *Daley v. Koch,* 892 F.2d 212, 215 (2d Cir.1989) we stated the obvious fact that a person found unsuitable for a particular position has not thereby demonstrated an impairment substantially limiting such person's major life activity of working. In fact, every circuit to visit this issue has so ruled.") (citing cases); *id.* at 724 (where plaintiff could not continue her work as blood bank administrator because her asthmatic condition was exacerbated by the facility's ventilation system, Court provides that "[n]othing suggests plaintiff's education and previous job experiences would hinder her ability to find a suitable position in the general field of administration."); *Daley v. Koch,* 892 F.2d 212, 214–15 (2d Cir.1989) (unsuccessful police department candidate suffering from "poor judgment, irresponsible behavior and poor impulse control" but no "particular psychological disease or disorder" was not disabled within the meaning of the ADA because he had failed to meet the "unique qualifications" of the job and be-

cause "[b]eing declared unsuitable for the *particular position* of police officer is not a substantial limitation of a major life activity.") (emphasis added); *id.* at 215 (also finding that plaintiff's "personality traits could be described as commonplace; they in no way rise to the level of an impairment.").

In *Redlich v. Albany Law School of Union University,* 899 F.Supp. 100, 107 (N.D.N.Y. 1995), the Court considered that for purposes of the regulation defining substantial impairment in the major life activity of working, plaintiff's *"class"* of job was "that of law professor." *Id.* Surely, if a law professorship is a sufficiently broad "class" of jobs, so is the still broader "class" of jobs encompassed by "law practice"—plaintiff's chosen field.

When all is said and done, then, the cases and regulations discussed above confirm my conclusion that the practice of law is a sufficiently broad "class" of jobs for purposes of defining plaintiff's substantial limitation in the major life activity of working. Unlike the plaintiffs in *Forrisi* and *Jasany,* Dr. Bartlett has been impeded from participation in an entire field of employment—not just a particular job with a particular employer. Therefore, having concluded that the appropriate demographic group to which plaintiff should be compared is a group of individuals with similar background, skills, and abilities, I now move to the question whether when compared to this population, plaintiff is qualified for her position and whether she is substantially impaired in the major life activity of working.

### 2. *A Finding of Substantial Impairment*

■ As noted, an essential predicate to interpreting plaintiff's reading ability is the establishment of the criterion against which they will be measured. Plaintiff argues that the proper metric is comparison to people with educational achievement comparable to her own. She proposes using the average scores of college graduates as the appropriate proxy, because that is the highest educational level against which the Woodcock and the WRAT are normed. Were norms

available for law school graduates or bar exam test-takers, she advocates those be used. I agree.

I take judicial notice of the fact that in 1993, 21.9% of the adult U.S. population had graduated from a four-year college. *See* Chart No. 238, Educational Attainment: 1960 to 1994, *Statistical Abstract of the United States* (1995). In 1994, less than one half of one percent of the adult population (861,000 out of 180 million) were lawyers. *Id.,* Chart No. 649, Employed Civilians, by Occupation.

Plaintiff maintains that her ability to take the Bar Examination must be measured against this standard and that for the reasons set forth by her experts, she is significantly disabled because she cannot read in the same condition, manner, or duration as other law students. I agree with plaintiff and her experts that plaintiff cannot and does not read like the average law student. As a practical matter, I concur with Dr. Hagin that an average law school graduate reads significantly faster than the 4th percentile of a college student score on the DRT and with substantially greater automaticity.[23] For this reason, and applying the standards articulated above, I conclude that plaintiff has proven by a preponderance of the evidence that she is substantially impaired in the major life activity of working and thereby is a disabled individual, as that term is understood both under the ADA and Section 504.

### E. *Qualified for the Job*

Now that the Court has determined that the practice of law is the relevant category of jobs from which plaintiff has been excluded because of her substantial impairment, and that plaintiff is "substantially limited" in this major life activity of working, it remains to be discussed whether plaintiff is qualified to perform the job. *See Borkowski v. Valley Central School District,* 63 F.3d 131, 137–38 (2d Cir.1995) (providing that "plaintiff bears the burden of proving either that she can

---

**23.** *See* Dr. Hagin's description of plaintiff's abilities as compared with college freshmen, Conclusions of Fact, II, B.3, *supra.*

meet the requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential functions.").

This Court is cognizant of the fear of many legislators, judges, and scholars, that opening the door for disabled Americans to enter professions of their choice could lead to absurd results such as the first baseman with the bad elbow suing for damages or an accommodation under the ADA. This argument was cogently rebuked by the *Black* Court. I quote the *Black* Court's discussion on this point in full:

> The Administrative Law Judge was concerned that focusing on particular jobs or particular fields rather than on employability in general would lead to anomalous results.
>
> ... To illustrate: a person may have as his life's dream employment as a running back with the Dallas Cowboys. He may be denied this employment solely on the basis of his inability to run 100-yards in 10 seconds or less. This person would then have an "impairment" (condition lessening physical ability) which actually prevented his obtaining particular, desired employment. Yet this person would not be considered "handicapped" within the meaning of the statutory definition since this particular impairment is not likely to impact adversely on his employability (since few jobs require this particular talent). The same point could be illustrated by a concert pianist with too-short fingers, or a 5′5 basketball star. These individuals have conditions which may actually affect their ability to obtain a particular job. But they are not "handicapped" within the meaning of the statutory definition because their respective impairments are not likely to affect their employability generally, measured against the full spectrum of possible employments.

Administrative Law Judge's Decision, at 12. The Judge's concerns are misplaced. It is true that the individuals he discusses would not be protected by the Act, but the reason is not because their impairment did not substantially limit employability. The individuals he discusses are not "capable of performing a particular job" and hence are not "qualified handicapped individuals" within the meaning of 60 C.F.R. § 60–741.2. An individual who is 5′5 is not capable of performing the job of center on the New York Knicks. An individual with extremely short fingers is not capable of performing the job of concert pianist. An individual who runs the 100 in 27 seconds is not capable of performing the job as running back for the Dallas Cowboys. Thus, what appears to be a major rationale for the definition adopted by the Administrative Law Judge disappears.

*Black,* 497 F.Supp. at 1100.

While largely approving of the *Black* rationale (calling *Black* "the most comprehensive examination by a court to date of the ... definition of 'handicapped'"), the Court in *Jasany v. United States Postal Service,* 755 F.2d 1244 (6th Cir.1985)—also cited by the EEOC—opined that *Black* "did not adequately analyze the focus and relationship of the definitional elements of the statute—impairment, substantial limitation of a major life activity, and qualified person." *Jasany,* 755 F.2d at 1249. The Court wrote:

> The *Black* Court was right in rejecting the ALJ's illustrations of people incapable of playing professional sports, but for the wrong reason. Characteristics such as average height or strength that render an individual incapable of performing particular jobs are not covered by the statute because they are not impairments. The distinction can be an important one. The burden is on the plaintiff to establish the existence of an impairment that substantially limits a major life activity as an element of the plaintiff's prima facie case. Once a prima facie case has been presented, the burden shifts to the defendant employer to demonstrate that challenged criteria are job related and required by business necessity, and that reasonable accommodation is not possible.

*Id.; see also id.* at 1250 n. 5 (noting the purported "error in the professional athlete hypotheticals" by stating that "those individuals probably could not show that they were

qualified for the position in question even apart from their 'handicap.' ").

Despite the fact that the two courts disagree on the approach to identifying when a disabled person is entitled to accommodations, their views are not mutually exclusive. I simply view the two cases as alternative holdings under the ADA. Hence, the most important thing to be gleaned from the *Black* and *Jasany* Courts' discussion is that two separate grounds under the law exist to dispel the specter of an individual being able to bring suit alleging that his or her rights were violated because he or she was unable to secure a specialized position like that of a Yankees first baseman. First, using the *Black* analysis, the individual would not be considered a "qualified individual" for the position: his or her inability to throw and catch exceptionally well would disqualify him or her from the requirements of the job. Second, under the *Jasany* analysis, the individual's poor throwing ability (or other "average" limitations) would not be deemed an "impairment" under the law, so a prima facie case of disability discrimination could never be made. These two legal protections are routinely invoked in accommodations cases. Numerous decisions are based on the fact that an individual's impairment, unfortunately for the individual, goes directly to a necessary function of the job—as with the pilot of a commercial airline whose vision does not permit him or her to see clearly enough to pass safety standards. *See* 29 C.F.R. Pt. 1630, App. Section 1630.2(j).

■ Hence, with these standards in mind, it is clear that courts should consider two essential questions in evaluating a plaintiff's career choice——has the plaintiff demonstrated that he or she is qualified to perform the job at issue and, if so, does he or she have a substantial impairment in performing that job. Having already found that Dr. Bartlett is substantially impaired in the major life activity of working, I now turn to the question of whether she is otherwise qualified to perform as a legal practitioner.

There is no insinuation, and I cannot find, that Dr. Bartlett is incapable of performing the functions of a practicing lawyer. She practiced as a law clerk in a law firm before she was terminated due to her inability to pass the bar examination. Through self-accommodation and other accommodations from a reasonable employer, plaintiff is and will be perfectly capable of fulfilling the essential functions of lawyering. Moreover, speed in reading is not tested by the bar examination, nor is speed in reading one of the essential functions of lawyering. *See,* Part F, *infra,* (noting that speed and visual ability to read are not what is tested by the bar examination, nor what are required of practicing attorneys). Therefore, while it is undoubtedly true that not every person is physically able to be a Yankees first baseman, it is likewise true that it would be grossly unfair to impede whole classes of individuals like plaintiff, with plaintiff's automaticity and reading rate disabilities, from participating in entire classes of customary professions such as the practice of law because they can not read a professional examination like average law school (or other professional school) graduates. This was unquestionably the reasoning of the *Black* and *Jasany* courts, and that reasoning was implicitly sanctioned by the EEOC's citation to the cases in its Interpretive Guidance of the regulations. *See* 29 C.F.R. Pt. 1630, App. Section 1630.2(j) (citing *Forrisi v. Bowen,* 794 F.2d 931 (4th Cir.1986); *Jasany v. U.S. Postal Service,* 755 F.2d 1244 (6th Cir. 1985); *E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088 (D.Hawai'i 1980)).

### F. *Proof of Discrimination under the ADA and Section 504*

To establish liability under the ADA and Section 504, plaintiff must prove by a preponderance of the evidence that she was a qualified person with a disability and that "by reason of such disability," she was "excluded from participation or denied the benefits of the services, programs, or activities of a public entity, or [was] subjected to discrimination by any such entity." 42 U.S.C. § 12132. Alternatively, plaintiff can establish defendants' liability by a preponderance of the evidence under Title III of the ADA. Although Title III generally applies only to private entities, the examination provision has unanimously been held to apply to public

entities, and specifically to state bar examinations, including New York's. *See, e.g., Argen,* 860 F.Supp. at 87; *Pazer,* 849 F.Supp. at 286–87; *D'Amico v. New York State Bd. of Law Exam'rs,* 813 F.Supp. 217, 221 (W.D.N.Y.1993); *In re Petition of Rubenstein,* 637 A.2d 1131, 1136–37 (Del.1994) (noting that "in the interpretive analysis of its Title III regulations, the United States Department of Justice has taken the position that '[e]xaminations covered by this section would include a bar exam.'") (citing ADA Handbook, III–100, Oct. 1991.). This is so because "person" is defined generally in the ADA to cover public entities. *See* 42 U.S.C. § 12111(7).

Specifically referring to licensing procedures such as the bar examination at issue here, Title III states that:

Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

42 U.S.C. § 12189.

The relevant implementing regulation promulgated by the Department of Justice under Title III states that:

[A]n examination covered by this section must assure that (i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

28 C.F.R. § 36.309(b)(1)(i).

■ For comparison, the EEOC-promulgated regulations under Title I pertaining to the administration of tests for employment provides:[24]

It is unlawful for a covered entity to fail to select and administer tests concerning employment in the most effective manner to ensure that, when a test is administered to a job applicant or employee who has a disability that impairs sensory, manual or speaking skills, the test results accurately reflect the skills, aptitude, or whatever other factors of the applicant or employee that the test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

29 C.F.R. § 1630.11. The EEOC's Interpretive Guidance on this provision further elucidates the agency's thinking in promulgating the regulation and provides a useful analytical approach for this Court:

The intent of this provision is to further emphasize that individuals with disabilities are not to be excluded from jobs that they can actually perform merely because a disability prevents them from taking a test, or negatively influences the results of a test, that is a prerequisite to the job. Read together with the reasonable accommodation requirement of section 1630.9, this provision requires that employment tests be administered to eligible applicants or employees with disabilities that impair sensory, manual, or speaking sills in formats that do not require the use of the impaired skill.

. . . . .

Thus, for example, it would be unlawful to administer a written employment test to an individual who has informed the employer, prior to the administration of the test, that he [or she] is disabled with dyslexia, and unable to read. In such a case, as a reasonable accommodation and in accordance with this provision, an alternative oral test should be administered to that individual.

. . . . .

**24.** I have previously determined that the regulations promulgated by the EEOC pursuant to Title I are useful in elucidating the appropriate standards under the ADA. *See* Part I, *supra.*

Other alternative or accessible test modes or formats include the administration of tests in large print or braille, or via a reader or sign interpreter.... An employer may also be required, as a reasonable accommodation, to allow more time to complete the test.

29 C.F.R. Pt. 1630, App. Section 1630.11. The only exception to the rather stringent and straightforward requirements articulated above is the EEOC's reminder that "[t]his provision does not apply to employment tests that require the use of sensory, manual, or speaking skills where the tests are intended to measure those skills." *Id.* Specifically referring to dyslexics, the EEOC wrote:

Thus, an employer could require that an applicant with dyslexia take a written test for a particular position if the ability to read is the skill the test is designed to measure. Similarly, an employer could require that an applicant complete a test within an established time frame if speed were one of the skills for which the applicant was being tested. However, the results of such a test could not be used to exclude an individual with a disability unless the skill was necessary to perform an essential function of the position and no reasonable accommodation was available to enable the individual to perform that function, or the necessary accommodation would impose an undue hardship.

*Id.* The question, then, of course, is whether the bar examination is a test intended to measure the applicants' ability to read or ability to perform under specific time constraints, and, necessarily, whether those abilities are "essential functions" of being a lawyer. For several reasons, I find that this is not the purpose of the bar examination and that these are not "essential functions" of being a lawyer as determined by the examination.

First, the notion that the bar examination is intended to be a reading test is most strongly belied by the fact that numerous accommodations, including time extensions, are granted every year to persons whose physical impairments make it difficult visually to read, including persons who are blind. If the bar examination were intended to test a person's visual ability to read or a person's ability to perform under time pressure, there would be no blind attorneys. Thankfully, this is very far from the reality of modern law practice. Given that defendants admit that they grant accommodations to persons with various types of disabilities, they are estopped from arguing that the bar examination is intended to test either reading or the ability to perform tasks under time constraints.

Second, I find that even if this were the purpose of the bar examination—which it certainly is not, as revealed by defendants' very practice of granting accommodations in numerous cases—the visual ability to read and the ability to perform tests under time constraints are not "essential functions" of a lawyer. In fact, at least one of my colleagues, on the District of Columbia Circuit Court of Appeals, does not have the visual ability to read. He reads braille instead, and uses the services of a reader and a dictaphone. This is but one powerful example of an attorney with an impairment who has been able to practice law. Clearly, being able to see and quickly comprehend visual images on a page is not "essential" to the practice of law.

The Board may be within its rights to declare that extra time would impair the integrity of the bar examination, provided it can demonstrate that the ability to perform legal tasks under the bar examination's time constraints is essential to minimal competence in the practice of law, and that the bar examination actually intends to test this skill. *See Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (holding that a nursing program need not adjust its training procedures to accommodate a person who, because of her disability, could not serve the nursing profession "in all customary ways"). Although "reading, thinking, and writing under time constraints are important skills of a competent lawyer," (Swain Aff. ¶ 7), Taylor Swain, a member of the Board, conceded that the bar examination is not a "speeded" test—it is not intended and does not measure the ability of applicants to answer questions within time constraints. Instead, the Exam-

iners presume that adequate time exists for the average person to answer the questions posed. (*See* Tr. at 1661 ("under normal circumstances, most normal candidates have sufficient time to complete the examination"); Tr. at 1666 (the Board has never done a study to measure reading rate necessary to take examination).)

Because I find that plaintiff is disabled and that she was denied reasonable accommodations in taking the bar examination even though she was otherwise qualified, I must find that her rights under the ADA and under Section 504 were violated. *See D'Amico*, 813 F.Supp. at 221 ("[T]o succeed on a claim under the ADA, plaintiff must show (1) that she is disabled, (2) that her requests for accommodations are reasonable, and (3) that those requests have been denied."). Although defendants try to escape this liability by shrouding themselves under the banner of the Eleventh Amendment and hiding behind the expert opinion of their consultant, Dr. Vellutino, I cannot excuse them from their obvious liability in this case.

In essence, defendants attempt a burden shifting defense: that they are, as state actors, entitled to special deference in their policy determinations with regard to disabilities and its application to specific applicants. They also claim that because they make their determinations based on an expert's opinion, they are entitled to deference in their judgment that an applicant should not be accommodated. (Tr. at 2168.) I disagree. The ADA makes no distinctions regarding the burdens of proof allocated to covered entities, and explicitly strips the states of their Eleventh Amendment immunity. *See* 42 U.S.C. § 12202. No court has accorded a state entity such deference, although several courts have deferred to academic institutions in their judgments as to assessing whether disabled students are "otherwise qualified" and to the sculpting of "reasonable accommodations." *See, e.g., Doe v. New York Univ.*, 666

F.2d 761, 776 (2d Cir.1981); *Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19, 26 (1st Cir.1991). Clearly, deference is due a state in determining the qualifications an individual needs to practice law in that state. *See also Whitfield v. Illinois Board of Law Examiners*, 504 F.2d 474, 477 (7th Cir.1974) ("Admission to practice in a state and before its courts is primarily a matter of state concern. And the determination of which individuals have the requisite knowledge and skill to practice may properly be committed to a body such as the Illinois Board of Law Examiners. A federal court is not justified in interfering with this determination unless there is proof that it was predicated upon a constitutionally impermissible reason.") (citations omitted). *But cf. Schware v. Board of Bar Examiners of State of New Mexico*, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957) ("A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law.").

The issue here, however, is different: Are defendants improperly identifying learning or reading disabled applicants? On this question, no deference is due because no deference is due to the Board's or expert's determinations of what defines a learning disabled applicant. This is an issue of fact for the trier of fact, and as previously stated, I find that plaintiff has shown by a preponderance of the evidence that she is disabled under the law.

## II. PLAINTIFF'S EQUAL PROTECTION CLAIM

### A. *The Appropriate Standard of Review*

At least until the passage of the ADA in 1990,[25] it was clear that the rational basis

---

**25.** Although the ADA was passed in 1990, its effective date was not until January 26, 1992. *See* 42 U.S.C.A. § 12181. Therefore, many courts who reviewed legislation or action disadvantaging the handicapped after 1990 did not address the question of the statute's effect on the level of review because the cases before them were filed before the effective date of the statute.

*See, e.g., Duc Van Le v. Ibarra*, 1992 WL 77908, *9 (Colo.1992) (en banc) (declining to apply strict scrutiny to disabled in part because the ADA "is not applicable here because this case was not brought under that Act and that Act was not in effect at the time of trial."), *cert. denied*, 510 U.S. 1085, 114 S.Ct. 918, 127 L.Ed.2d 207 (1994); *Tomsha v. City of Colorado Springs*, 856

standard was the appropriate standard of review under the Equal Protection Clause for reviewing purported instances of discrimination against handicapped individuals. In *City of Cleburne v. Texas, Cleburne Living Center, Inc.,* 473 U.S. 432, 446, 105 S.Ct. 3249, 3257–58, 87 L.Ed.2d 313 (1985), the Supreme Court wrote that "absent controlling congressional direction," the Court would "devise[ ] standards for determining the validity of . . . official action that is challenged as denying equal protection." *Id.* at 439–40, 105 S.Ct. at 3254. After considering whether and how certain groups have come to receive heightened review under the Equal Protection Clause, the Court in the end concluded:

> If the large and amorphous class of the mentally retarded were deemed quasi-suspect . . . it would be difficult to find a principled way to distinguish a variety of other groups who perhaps have immutable disabilities setting them off from others, who themselves cannot mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large. One need mention in this respect only the aging, the *disabled,* the mentally ill, and the infirm. We are reluctant to set out on that course, and we decline to do so.

*Id.* at 445–46, 105 S.Ct. at 3257–58 (emphasis added).

Congress' passage of the ADA in 1990 cast some doubt[26] on this holding to the extent that in the congressional findings accompanying the Act, Congress intimated that the disabled should be deemed a suspect class for purposes of equal protection review. Invoking the classic language attributed to "suspect" classes in constitutional jurisprudence, *see United States v. Carolene Prods.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938), the Congress wrote:

> [I]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society;

42 U.S.C.A. § 12101(a)(7) (reporting Congress' various findings under the statute). Several questions arise from Congress' invocation of this language. It is unclear what Congress attempted to effect by this language—whether Congress intended to force the courts to subject legislation or behavior respecting disabled persons to strict scrutiny review or whether the Congress merely desired to send a message to the courts that a heightened level of review of the claims of disabled individuals was appropriate.

Predictably, the ambiguity within the Act has generated an ensuing confusion in the nation's courts regarding what level of review should be afforded the disabled in light of the ADA's findings. Numerous courts have held that the rational basis test re-

P.2d 13, 14 (Colo.Ct.App.1992) (rejecting claimant's strict scrutiny argument because the ADA "is applicable here because claimant was injured before its effective date."); *see also Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) ("Even if respondent were correct that heightened scrutiny applies, it would be inappropriate for us to apply that standard here. Both parties have been litigating this case for years on the theory of rational-basis review, which . . . does not require the State to place any evidence in the record, let alone the extensive evidentiary showing that would be required for these statutes to survive heightened scrutiny. It would be imprudent and unfair to inject a new standard at this stage in the litigation.").

**26.** For excellent discussions of the issue, *see* Lisa A. Montanaro, Comment, *The Americans with Disabilities Act: Will the Court Get the Hint? Congress' Attempt to Raise the Status of Persons with Disabilities in Equal Protection Cases,* 15 Pace L.Rev. 621 (1995); Amy S. Lowndes, Note, *The Americans with Disabilities Act of 1990: A Congressional Mandate For Heightened Judicial Protection of Disabled Persons,* 44 Fla. L.Rev. 417 (1992); *see also* James B. Miller, Note and Comment, *The Disabled, the ADA & Strict Scrutiny,* 6 St. Thomas L.Rev. 393 (1994); Neil D. O'Toole, *The ADA: Strict Scrutiny Protection for Disabled Workers,* 21 Colo. Law. 733 (1992); William H. Pauley III, *The Americans Disabilities Act of 1990: Cases of First Impression,* 455 PLI/Lit 403 (1993); Andrew Weis, *Peremptory Challenges: The Last Barrier to Jury Service for People with Disabilities,* 33 Willamette L.Rev. 1 (1997).

mains the appropriate standard for reviewing discrimination claims brought by the handicapped. *See, e.g., Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia,* 6 F.3d 990, 1001 (3d Cir.1993) (in affirmative action context, court holds that there was "no evidence that the ADA overruled *Cleburne,* and the limited case law is to the contrary. Moreover, we believe application of heightened scrutiny to the preference for handicapped business owners would run counter to the ADA, which Congress enacted to reduce discrimination against handicapped persons."); *Duc Van Le v. Ibarra,* 1992 WL 77908, *9 (Colo.1992) (en banc) (after finding the ADA inapplicable because the case was not brought until after the Act's effective date, holding that "[t]o declare the mentally ill to be a suspect or quasi-suspect class would be contrary to previous decisions of the United States Supreme Court that have interpreted the Equal Protection Clause of the United States Constitution."), *cert. denied,* 510 U.S. 1085, 114 S.Ct. 918, 127 L.Ed.2d 207 (1994). Other courts, taking at least the spirit of the legislation to heart in interpreting the federal Equal Protection Clause and other state and federal laws, have concluded that a higher level of review should be given to handicapped persons. *See, e.g., Martin v. Voinovich,* 840 F.Supp. 1175, 1208–10 (S.D.Ohio 1993) (applying intermediate scrutiny to disabled in light of ADA); *Trautz v. Weisman,* 819 F.Supp. 282 (S.D.N.Y.1993) (discussing the "revolution" resulting from the passage of the ADA and concluding in the context of a § 1985(3) prosecution that "[w]hile [the ADA] may not provide heightened scrutiny for discrimination against individuals with disabilities under the equal protection clause, it is relevant to Congress' interpretation of § 1985(3)."); *People v. Green,* 148 Misc.2d 666, 561 N.Y.S.2d 130, 132–33 (N.Y.Co.Ct. 1990) (discussing the ADA's purposes generally and finding that hearing impaired jurors should not be excluded from juries in part because "[d]isabled persons in general ... may constitute a 'suspect classification'" under New York's constitution;). Finally, many courts have applied the rational basis standard without discussing whether the passage of the ADA has changed or should change their thinking on the subject. *See, e.g., Suffolk Parents of Handicapped Adults v. Wingate,* 101 F.3d 818, 824–27 (2d Cir. 1996) (applying rational basis standard to claims of handicapped individuals who challenged state's denial of funding), *cert. denied,* ⸺ U.S. ⸺, 117 S.Ct. 1843, 137 L.Ed.2d 1047 (1997); *Story v. Green,* 978 F.2d 60, 64 (2d Cir.1992) (noting "in passing that most authorities have not considered disability to be a suspect or quasi-suspect classification"; providing no discussion of the ADA); *More v. Farrier,* 984 F.2d 269 (8th Cir.) (applying rational basis test without discussion), *cert. denied,* 510 U.S. 819, 114 S.Ct. 74, 126 L.Ed.2d 43 (1993). With no clear answer emanating from case precedent, I move to an analysis of Congress' intent in passing the ADA and whether Congressional legislation should alter Supreme Court precedent. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

### 1. *The Congress' Intent in Passing the ADA*

It is not entirely clear what the Congress intended by describing the disabled in its findings in a manner that would suggest that the group be deemed a suspect class. There does not appear to be any direct legislative history on the question. However, a comparison of the ADA's findings with another statute, the Religious Freedom Restoration Act ("RFRA"), suggests that Congress was probably not intending the ADA to change directly the level of review afforded disabled persons under the Equal Protection Clause. This conclusion can be gleaned from the difference between the two statutes. In RFRA, Congress expressly declared the level of review it believed should be afforded legislation impacting religious freedoms. *See* 42 U.S.C. § 2000bb(a)–(b) (stating that "governments should not substantially burden religious exercise without compelling justification" and that one of the purposes of RFRA was "to restore the compelling interest test ... and to guarantee its application in all cases where free exercise of religion is substantially burdened."). In contrast, the ADA does not

# 1134

expressly state that courts should employ either a strict scrutiny or even a quasi-strict (or "intermediate") level of review. *See* 42 U.S.C.A. § 12101(a)(7). Rather, Congress appears to be utilizing its recognizably superior fact-finding function, providing to the Court data from which it hopes the Court will arrive at the conclusion that disabled persons should be given heightened scrutiny under the Equal Protection Clause. Pronouncing a finding of fact, and couching it in such factual, not legal, terms, Congress likely intended the ADA to be a springing board from which the courts might themselves develop a stricter level of scrutiny for legislation or action impacting the disabled.

### 2. *The Congress' § 5 Power*

Congress' power to legislate changes in the level of the Court's scrutiny under the Equal Protection Clause is the source of some ambiguity in the law, resulting most noticeably in a difficulty in line-drawing[27] between what Congress can and can not do with its constitutionally-derived power to "enforce [the Fourteenth Amendment] by appropriate legislation." U.S. Const. amend. xiv.[28] Once again, a consideration of the legal fate of RFRA is instructive on the ADA's meaning and impact in this context.

The Supreme Court's recent invalidation of RFRA in *City of Boerne v. P.F. Flores,* — U.S. —, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) suggests an answer to the question whether Congress has the authority under § 5 of the Fourteenth Amendment to declare what level of scrutiny should be employed in equal protection cases. Although *Boerne* involved religious liberty and the Due Process, not the Equal Protection, Clause of the Fourteenth Amendment, the Supreme Court's

holding that Congress does not have the power to declare substantive protections, but only has the power to enforce them, is easily applicable to the instant question, particularly given that Congress' § 5 power is the same under both clauses.

■ In *Boerne,* the Supreme Court reiterated their prior holding that "as broad as the congressional enforcement power is, it is not unlimited." *Boerne,* — U.S. at —, 117 S.Ct. at 2163 (citing *Oregon v. Mitchell,* 400 U.S. 112, 128, 91 S.Ct. 260, 266-67, 27 L.Ed.2d 272 (1970) (Black, J.)). The Court stated that "[t]he design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States." *Id.* at —, 117 S.Ct. at 2164. Simply put, the Court explained that "Congress does not enforce a constitutional duty by changing what the right is." *Id.* Hence, at the very least, *Boerne* tells us that Congress may not, under the ADA, directly alter the level of scrutiny afforded the disabled under the Equal Protection Clause. What remains to be seen, however, is what will be done with Congress' fact-driven suggestion in the ADA that the courts themselves change the level of scrutiny afforded handicapped persons. For the reasons to be discussed, in the end, the question must be left for the Supreme Court to decide.

### 3. *Authority of this Court to Decide the Question*

■ Recently, the Supreme Court reaffirmed the notion in *Agostini v. Felton,* — U.S. —, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) that when a lower court is presented with a situation to which Supreme Court

---

**27.** *See City of Boerne v. P.F. Flores,* — U.S. —, —, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997) (admitting that "the line between [Congressional] measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern.... There must be a congruence or proportionality between the injury to be prevented or remedied and the means adopted to that end.").

**28.** For elucidating discussions of Congress' power under § 5, *see* Matt Pawa, Comment, *When the*

*Supreme Court Restricts Constitutional Rights, Can Congress Save Us? An Examination of Section 5 of the Fourteenth Amendment,* 141 U. Pa. L.Rev. 1029 (1993); Stephen L. Carter, *The Morgan Power and the Forced Reconsideration of Constitutional Decisions,* 53 U. Chi. L.Rev. 819 (1986). *See generally, Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (establishing that Congress' Section Five power permitted Congress to find an equal protection violation where the Supreme Court had not).

precedent has "direct application," the lower court should refrain from deciding the case inconsistently with prior precedent, and should leave to the Supreme Court "the prerogative of overruling its own decisions." *Id.* at ——, 117 S.Ct. at 2017 (quoting *Rodriguez de Quijas v. Shearson/American Express,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)); *see also Ellis v. District of Columbia,* 84 F.3d 1413, 1418 (D.C.Cir.1996) (applying *Rodriguez* rule); *Distribuidora Dimsa S.A. v. Linea Aerea Del Cobre S.A.,* 768 F.Supp. 74, 77 (S.D.N.Y.1991) (providing that "[a] district court has no authority to reject a doctrine developed by a higher court unless subsequent events make it 'almost certain that the higher court would repudiate the doctrine if given a chance to do so.' "). I find that the *Cleburne* case has direct application here, and that fact constrains my ability to determine whether the ADA has, or should, effect a change in the level of scrutiny afforded the disabled. Such a question must be brought to this nation's highest Court to decide.

### B. *The Legal Standard*

■ Having concluded that this Court should apply the traditional rational basis standard to claims brought by the disabled, as determined by the Supreme Court in *Cleburne,* "[t]he fundamental principles governing equal protection are well established." *United States v. Yonkers,* 96 F.3d 600, 611 (2d Cir.1996). "A plaintiff is required to show not only that the state action complained of had a disproportionate or discriminatory impact but also that the action was taken with intent to discriminate." *Id; see also E & T Realty v. Strickland,* 830 F.2d 1107, 1114 (11th Cir.1987) (providing that "[m]ere error or mistake in judgment when applying a facially neutral statute does not violate the equal protection clause. There must be intentional discrimination."), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). The Second Circuit has recently held that "[i]t is elemental that 'disparate treatment is not necessarily a denial of the equal protection guaranteed by the Constitution'; rather, the Supreme Court has afforded 'wide discretion . . . to the states in establishing acceptable classifications.' "

*Suffolk Parents of Handicapped Adults v. Wingate,* 101 F.3d 818, 824–25 (2d Cir.1996). The Court has steadfastly held that states "must have substantial latitude to establish classifications that roughly approximate the nature of the problems perceived, that accommodate competing concerns for both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Id.* "The general rule, therefore, is that 'state legislation or other official action that is challenged as denying equal protection . . . is presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest.' " *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)). *See also Ricketts v. City of Hartford,* 74 F.3d 1397, 1407 (2d Cir.) ("It is well established that a claimant under the Fourteenth Amendment's Equal Protection Clause . . . must establish intentional discrimination.") (citing *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1766–67, 95 L.Ed.2d 262 (1987)), *cert. denied,* —— U.S. ——, 117 S.Ct. 65, 136 L.Ed.2d 26 (1996); *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) ("To prove an equal protection violation, claimants must prove purposeful discrimination.").

### C. *Application to Plaintiff's Case*

■ While plaintiff has established the presence of a number of troubling facts, such as the fact that for the years at issue, applicants claiming a learning disability were approximately 3.5 times more likely to be denied accommodations than those claiming other types of disabilities, I cannot find that plaintiff has demonstrated that any such effect was intentional or that the Board's underlying purpose was irrational. In the Board's defense, physical disabilities may be more susceptible to scientific testing, and the "chaos" in the learning disability field creates less exactitude in identifying a reading disability. *Cf., Heller v. Doe,* 509 U.S. 312, 321, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993) (upholding under the rational basis standard a Kentucky statute under which "the applicable burden of proof in mental retardation

commitment proceedings is clear and convincing evidence while the standard in mental illness proceedings is beyond a reasonable doubt" in part because "mental retardation is easier to diagnose than is mental illness.") Therefore, despite my concerns about the Board's practices, I find that the Board's procedures, including the subjection of applicants' reports to review by an expert, are rationally related to the legitimate government end of discerning whom should be afforded accommodations on the state bar examination.

However, I must note that the perception of bias generated by the disparate effect noted above is exacerbated by the suspicion with which the Board views learning disabled applicants. Of great concern to this Court were reports by two reputable witnesses of direct bias comments by Fuller, Executive Secretary of the Board. (*See* Duchossoi Aff. ¶¶ 6, 7, and 8 (Learning Services Program Coordinator at New York University alleges Fuller told her he had 1) "to confess to a certain cynicism as to the existence of learning disabilities to begin with"; and 2) "anyone who has the money can pay for a report [concerning a learning disability]" and "too many times I see testing reports that I really doubt are legitimate"; and 3) "You have to realize that the law is a learned profession and I am not sure that a person with a learning disability should aspire to such a goal."); Rosenthal Aff. ¶ 24 (a learning disabled applicant initially denied accommodations by the Board, now a licensed lawyer, claims Fuller told her that it was "his job to protect the public from incompetent and incapable lawyers" and the public would be "unaware that they would be purchasing a defective product in the case of learning disabilities.").)

Much of the Board's bias appears to arise from its presumption that giving extra time to applicants with learning disabilities or impairments gives them an unfair advantage over other applicants. Fuller testified that he believed the Bar Examination's ability to certify the minimal competence of applicants was impaired when the examination was taken with extra time. (Tr. at 912.) Similarly, Taylor Swain, a Board member, testified at

trial that psychometric principles taught that giving extra time to some applicants compromised the results of the test because the test would not be measuring the same factors. (Tr. at 1676–77.)

I am also concerned that Board members have not taken the time to familiarize themselves with the qualifications of its experts or the criticisms that exist against Vellutino's school of thought in the field. (Tr. at 1682–83 (The Board has delegated to Fuller responsibility to find experts and to ensure that Fletcher and Vellutino are "respected and noted experts in the field." She has had no direct contact with anyone other than Vellutino.); Tr. at 974, 979 (until recently, Fuller had interviewed no one other than Dr. Vellutino to advise the Board on learning disabilities. Current experts are recommended by Dr. Vellutino).) As discussed, there is no unanimity in the profession in how to define or identify a learning disability. *See generally* Tamar Lewin, *Fictitious Learning–Disabled Student is at Center of Lawsuit Against College*, N.Y. Times, April 8, 1997, at B9 (discussing the problems inherent in identifying learning disabled students and the bias against them which often ensues). By relying on one theory alone and by failing adequately to advise applicants of such reliance, the Board may be discriminating against applicants who qualify as learning disabled under the law.

Nevertheless, despite these suggestions of potential bias, I cannot find that plaintiff has proven that the Board *intentionally* discriminated against applicants with learning disabilities or against plaintiff herself, particularly when the Board has come forward with "rational" explanations for its procedures. Dr. Vellutino is a respected research scientist in the field of children's learning disabilities. As noted, however, the field of learning disabilities is replete with chaos. Dr. Vellutino's theories, while not in the mainstream of the learning disability diagnostic community, are at the very least rational, particularly when it comes to determining whether an applicant is substantially disabled as compared to an average person. Dr. Vellutino and the Board simply did not recognize that the proper measure of comparison is not to

an average population, but rather is to an average person performing the task at issue, *i.e.*, the average law school graduate reading on a test like the bar examination.

Finally, even plaintiff's own experts in their evaluations did not address or identify plaintiff's reading problem with clarity. Dr. Massad did not even mention plaintiff's automaticity problem in the report he sent to the Board. Neither Dr. Massad nor Dr. Hagin addressed plaintiff's reading rate problem in their reports. Dr. Hagin did not provide the comparison data concerning plaintiff's reading rate on the DRT until requested to do so by the Court. Clearly, under these circumstances, it is not irrational for the Board to use an expert to assist in the evaluation of such clinicians' reports. Likewise, the choice of Dr. Vellutino as that expert was perfectly rational, as were Dr. Vellutino's theories. Plaintiff's equal protection claim is therefore denied.

### III. PLAINTIFF'S DUE PROCESS CLAIM [29]

#### A. *Constitutional Underpinnings*

■■■■ It is axiomatic that "[a]dmission to practice [law] in a state and before its courts is primarily a matter of state concern [and that] the determination of which individuals have the requisite knowledge and skill to practice may properly be committed to a body such as the [ ] Board of Law Examiners." *Whitfield v. Illinois Board of Law Examiners*, 504 F.2d 474, 477 (7th Cir. 1974); *see also Newsome v. Dominique*, 455 F.Supp. 1373 (E.D.Mo.1978) (citing *Whitfield* and providing that "[a]llegations of arbitrary cutoff scores and retesting procedures are simply insufficient to justify this Court's intervention into matters entrusted to the Missouri Supreme Court."). However, it is equally axiomatic that "[a] State cannot ex-

clude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process ... Clause of the Fourteenth Amendment." *Schware v. Board of Bar Examiners of the State of New Mexico*, 353 U.S. 232, 238–39, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957). Hence, while it is uncontroverted that "[a] State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar," it must be remembered that "any qualification must have a rational connection with the applicant's fitness or capacity to practice law." *Id.* at 239, 77 S.Ct. at 756. In time-honored precedent, the Supreme Court has written that:

> Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church. Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory.

*Id; see also id.* at 246–47, 77 S.Ct. at 760–61 (holding that State violated due process where it denied plaintiff opportunity to sit for bar exam and thereby "qualify for the practice of law" where there was "no evidence in the record which rationally justifies a finding that [plaintiff] was morally unfit to practice law").

As will be discussed below, however, the instant case does not implicate a state's prerogative to establish criteria for admission to the bar. Rather, this case involves a state agency's purported violation of a federal statute. Nevertheless, before I proceed to a consideration of plaintiff's due process claim, I must determine as a threshold matter

---

**29.** Defendant asserts that "[p]laintiff never alleged a due process claim in her complaint and never included one in the PTO and concludes from this that it is improper at this late date to add a new claim." (Def. Post–Trial Brief at 107). While defendant concedes that "[p]laintiff's claims now raised as due process violations, were previously raised as equal protection violations in the Pre–Trial Memorandum of Law," (*id.*) the defendant urges this Court not to consid-

er the new claim "unless plaintiff makes an application to reopen the record and defendants are given an opportunity to respond to specific allegations." (*Id.* at 4 n. 1).

The Court will consider the due process argument, however, because the facts underlying the claim were clearly established at the time of trial and since then the question has been fully briefed by the parties.

whether this Court has jurisdiction to hear plaintiff's arguments.

### B. *Threshold Question: Jurisdiction over Due Process Claim*

As a threshold matter, it must be decided whether this Court has authority to hear the merits of plaintiff's due process claim. Defendants argue that under Second Circuit and Supreme Court precedent, this Court is prevented from reviewing the Board's determination or conduct under the due process clause. They cite precedent establishing that under the due process clause "[a] federal court's review of state administrative proceedings is limited to whether the state has provided adequate avenues of redress to review and correct arbitrary action." *FSK Drug Corp. v. Perales,* 960 F.2d 6, 11 (2d Cir.1992) (providing that court lacked jurisdiction to hear due process claim where former Medicaid provider brought action against Commissioner of New York Department of Social Services to challenge denial of re-enrollment application without prior hearing). They emphasize that "[a] section 1983 action is not an appropriate vehicle to consider whether a state or local administrative determination was arbitrary or capricious." *Id.* (noting that "[t]his claim could have been, but was not, raised in a state court proceeding under [Article 78].""); *see also Alfaro Motors v. Ward,* 814 F.2d 883, 888 (2d Cir.1987) (same) (citing *Parratt v. Taylor,* 451 U.S. 527, 543–44, 101 S.Ct. 1908, 1916–17, 68 L.Ed.2d 420 (1981) and *Hudson v. Palmer,* 468 U.S. 517, 534–36, 104 S.Ct. 3194, 3204–05, 82 L.Ed.2d 393 (1984)); *Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 832 n. 9 (1st Cir.) ("Where a state has provided reasonable remedies to rectify a legal error by a local administrative body ... current authority indicates that due process has been provided, and that section 1983 is not a means for litigating the correctness of the state or local administrative decision in a federal forum."), *cert. denied,* 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982); *but cf., id.* (providing that "[a] different situation may be presented in some instances, particularly in the realm of equal protection, involving gross abuse of power, invidious discrimination, or fundamentally unfair procedures.... Different considerations may also be present where recognized fundamental constitutional rights are abridged by official action or state regulation."). However, defendants' analysis on this issue is wholly cursory. Upon deeper exploration, it is clear that precedent dictates that this Court has jurisdiction over plaintiff's due process claim.

In *Hellenic American Neighborhood Action Committee v. City of New York,* 101 F.3d 877, 880–81 (2d Cir.1996), the Second Circuit articulated the pragmatic considerations that underlie the rule that federal courts should not review deprivations of due process which can be redressed in the form of an adequate state postdeprivation remedy:

> When a deprivation occurs because of a random, arbitrary act by a state employee, it is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place. The loss of property, although attributable to the State as action under 'color of law,' is ... almost ... [invariably] beyond the control of the State. Indeed, in most cases it is not only impracticable, but impossible, to provide a meaningful hearing before the deprivation.... Furthermore, that an individual employee himself is able to foresee a deprivation is simply of no consequence. The controlling inquiry is whether the state is in a position to provide for predeprivation process.

101 F.3d at 880 (citing *Hudson v. Palmer,* 468 U.S. at 532–33, 104 S.Ct. at 3203–04) (citations and internal quotation marks omitted).

The Supreme Court's lengthy discussion of the question in *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) is instructive on the question of whether and when a federal due process claim will be preempted by the availability of an adequate state postdeprivation remedy. *Zinermon* involved a patient who was admitted to a state mental health facility pursuant to voluntary admission forms he signed while heavily medicated. The patient brought an action against the facility and other state defendants alleging that he was

thereby deprived of his liberty without due process of law. The *Zinermon* Court held that regardless of whether the plaintiff had adequate postdeprivation tort remedies under state law, his allegations were sufficient to state a claim under the federal due process clause as well. Referring to the *Parratt* line of cases which decline review of alleged due process violations where there is an adequate state remedy available, the Supreme Court rejected the cases' application to the situation before them and held that "[b]ecause petitioners had state authority to deprive persons of liberty, the Constitution imposed on them the State's concomitant duty to see that no deprivation occur without adequate procedural protections." *Id.* at 135, 110 S.Ct. at 980. The Court wrote:

> It may be permissible constitutionally for a State to have a statutory scheme like Florida's, which gives state officials broad power and little guidance in admitting mental patients. But when those officials fail to provide constitutionally required procedural safeguards to a person whom they deprive of liberty, the state officials cannot then escape liability by invoking *Parratt* and *Hudson* .... [Plaintiff's] suit is neither an action challenging the facial adequacy of a State's statutory procedures, nor an action based only on state officials' random and unauthorized violation of state laws. [Plaintiff] is not simply attempting to blame the State for misconduct by its employees. He seeks to hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue.

*Id.* at 135–36, 110 S.Ct. at 988–89. The question for this Court, then, is whether the Board's unique policy of reviewing applications of purportedly learning disabled candidates was an established state procedure or instead a random, unauthorized act by state employees. I find here that plaintiff is challenging a state procedure, and not a random act by a state employee.

In *Zinermon,* the Court articulated three reasons that the case was not controlled by the *Parratt* line of cases. First, the Court stated that "petitioners cannot claim that the deprivation of [plaintiff's] liberty was unpredictable" because it "is hardly unforeseeable that a person requesting treatment for mental illness might be incapable of informed consent." *Id.* at 136, 110 S.Ct. at 989. The Court distinguished the situation in *Parratt* and *Hudson* by stating that in those cases, while it might be anticipated that losses would occur, it was unknown at precisely what point they could be expected. However, in *Zinermon,* the Court found that "[a]ny erroneous deprivation will occur, if at all, at a specific, predictable point in the admission process—when a patient is given admission forms to sign." *Id.* Such is the case with Dr. Bartlett's claim as well. The State can anticipate that if the Board is using arbitrary and capricious practices or procedures to determine who is eligible for accommodations on the state bar exam, such a deprivation of a liberty or property interest will occur at the particular stage in which the Board is reviewing applications for accommodations.

The second reason articulated by the Supreme Court in *Zinermon* is even more compelling and relevant to the present purposes. The Court persuasively distinguished *Parratt* and its progeny by explaining that a random act cannot be remedied by a pre-deprivation process, but a state policy generally can be corrected by a predeprivation process. *See id.* at 137–38, 110 S.Ct. at 989–90. In the instant case, predeprivation process is not impossible. Dr. Bartlett is not challenging the random, isolated action taken by a mere employee bent on a malicious purpose. Rather, she is challenging the stated policies and procedures of a State Board with virtually unreviewable authority to determine whether she receives the reasonable accommodations to which the ADA affords her.[30]

---

30. In *Dwyer v. Regan,* 777 F.2d 825 (2d Cir. 1985), the Second Circuit articulated an important caveat to the Supreme Court's analysis in this context and explained that "[a]lthough the [Supreme] Court found crucial the inability of states to anticipate the actions of depriving employees, it nonetheless must have recognized that a state, as an incorporeal entity, can establish policy, take action, and anticipate events only through its officials and employees." *Id.* at 832. The Court went on to hold that:

> [W]here the depriving actions were taken by a high-ranking official having final authority over the decision-making process, this Court

There is undoubtedly in this context a possibility for establishing adequate pre-deprivation process and procedure. In fact, it is clear that some pre-deprivation process and procedure is already in place.

Third and finally, the Supreme Court distinguished the *Parratt* line of cases by stating that where "[t]he State delegated to them the power and authority to effect the very deprivation complained of here ... and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful confinement," "petitioners cannot characterize their conduct as 'unauthorized' in the sense the term is used in *Parratt* and *Hudson*." *Id.* at 138, 110 S.Ct. at 990. The Court wrote that "[i]n *Parratt* and *Hudson*, the state employees had no similar broad authority to deprive prisoners of their personal property, and no similar duty to initiate ... the procedural safeguards required before deprivations occur." *Id.* Clearly, the instant defendants were likewise imbued with broad authority to determine and provide the legally required accommodations to persons meriting them under the ADA and/or the Rehabilitation Act. Like the defendants in *Zinermon*, then, they cannot look to the law for relief and attempt to characterize their actions as "unauthorized" actions by mere state employees. Rather, their broad authority to determine who is given accommodations on the state bar examination brings along with it a concomitant duty: the duty to see that such accommodations are not arbitrarily or capriciously withheld. *See also Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d 877, 880–81 (2d Cir. 1996) (distinguishing between due process claims that are based in "established state procedure" and due process claims premised on "random, unauthorized acts by state employees."); *Adams v. Chief of Security Operations*, 966 F.Supp. 210 (S.D.N.Y.1997) (holding that "[b]ecause the deprivation alleged in this case was allegedly neither random nor unauthorized and the defendants have not attempted to show that a predeprivation hearing was not possible or practicable, the availability of a postdeprivation state law remedy is not a sufficient basis to dismiss the complaint as a matter of law.").

For all of these reasons, I conclude that plaintiff has established this Court's jurisdiction to hear her due process claim.

## C. The Appropriate Focus of Plaintiff's Due Process Claim

As alluded to above, it is crucial to note at the outset of the examination of plaintiff's claim that plaintiff is *not* challenging defendant's failure to admit her to the New York State Bar. Such a review of a particular applicant's denial of admission to the bar can only be reviewed by the United States Supreme Court. *See District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 486, 103 S.Ct. 1303, 1316–17, 75 L.Ed.2d 206 (1983). Even where "the constitutional claims presented to a United States District Court are inextricably intertwined with the state court's denial in a judicial proceeding of a particular plaintiff's application for admission to the state bar," the district court does not have jurisdiction to hear the claim because in such an instance "the District Court is in essence being called upon to review the state court decision" regarding the particular applicant. *Id.* at 482–83 n. 16, 103 S.Ct. at 1315 n. 16.

Establishing qualifications for the practice of law and applying those criteria to individual applicants is somewhat different, however,

---

has found that they were not random or unauthorized within the meaning of *Parratt*. *Id.* The Court cited its prior opinion in *Burtnieks v. City of New York*, 716 F.2d 982 (2d Cir.1983) which involved the City's razing of an apartment building without giving its owner notice and an opportunity to be heard at a predemolition hearing. In that case, the Second Circuit rejected the City's arguments that because this was unlawful under City ordinances it could not have been expected by the state and held that "decisions made by officials with final authority over signifi-cant matters, which contravene the requirements of a written municipal code, can constitute established state procedure." *Id.* at 988; *see also Patterson v. Coughlin*, 761 F.2d 886, 891–93 (2d Cir.1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986); *but cf. Hellenic*, 101 F.3d at 880–881 (not mentioning line of cases which establish that actions by high-ranking officials with final authority over decisionmaking process are not deemed random or unauthorized).

from the conduct and determination at issue in the instant case. Here, plaintiff was applying for an accommodation in the taking of the New York state bar examination, and her due process challenge attacks defendant's practice of determining whether applicants were learning disabled by using an allegedly arbitrary cutoff score on one particular testing measure. Hence plaintiff is not aggrieved by her denial of admission to the bar. Rather, she challenges the Board's failure to grant her the reasonable accommodations in the taking of the bar examination to which she was entitled under the ADA and Section 504. Given that this factual context differs in important ways from the situation confronted in the cases where state bar qualifications are reviewed under federal due process, *see, e.g., District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 486, 103 S.Ct. 1303, 1316–17, 75 L.Ed.2d 206 (1983) (providing that "United States District Courts ... have subject matter jurisdiction over general challenges to state bar rules, promulgated by state courts in non-judicial proceedings, which do not require review of a final state court judgment in a particular case."), I will begin my analysis by addressing the Second Circuit's holding in *Charry v. Hall,* 709 F.2d 139 (2d Cir.1983).

In *Charry,* the Second Circuit addressed the question "whether the right to sit for an examination for admission to a profession represents a constitutionally protectable property or liberty interest comparable to a license already granted to practice that profession." 709 F.2d at 144. The plaintiff in that action, a Ph.D. graduate from New York University's Human Relations and Social Policy Department, challenged a state agen-

cy's finding that this program was not an accredited psychology program and that the plaintiff therefore could not sit for the examination required of all individuals seeking admission to practice psychology with a license. In examining the question whether the plaintiff's due process challenge could survive, the Second Circuit stated that "[t]he right to take an examination is hardly the equivalent of the grant of the license for which it is taken; the applicant may fail the examination, in which event, unlike the successful licensee, he will not have any property interest entitled to due process protection." *Id.* Defendants in this action make much of this language. (*see, e.g.,* Def.'s Post–Trial Mem. at 109–10.) However, upon closer examination, it is clear that the Second Circuit's holding in *Charry* is inapposite for at least two reasons.

First, and most importantly, the Second Circuit in *Charry* found that even though "[t]he right to take an examination is hardly the equivalent of the grant of the license for which it is taken," *id.,* the "arbitrary rejection of an application made by a fully qualified candidate can work a serious injustice on the applicant, depriving him of even the opportunity to obtain the license." *Id.* With this in mind, the Court concluded that it was "persuaded that an applicant satisfying statutory prerequisites has a 'legitimate claim of entitlement' to take the examination for the professional status of psychologist." *Id.* (providing that "[s]ince the present complaint ... raises a federal due process issue, the district court erred in dismissing it for lack of subject matter jurisdiction."). Although the *Charry* Court in the end determined that plaintiff's procedural due process claim failed under the *Mathews v. Eldridge* test,[31] it

---

**31.** The Court found that:

In the present case the private interest, *i.e.,* the fight to take an examination, while important enough to be classified as a constitutionally protectible property interest, hardly approximates the importance of a vested property right such as a license itself.

709 F.2d at 145. The Court, while somewhat troubled by the Board's procedures, in the end concluded that sufficient process under *Mathews v. Eldridge* was afforded the plaintiff. The Court stated that "[t]he administrative review procedure provided by the state ... is extensive and appears to us reasonably calculated to uncover and correct errors committed in denying an ap-

plicant the right to sit for an examination." *Id.* at 145. Furthermore, in rejecting the plaintiff's suggestion that he was entitled to an evidentiary hearing, the Court held that:

The possible occurrence of an error in one or two cases does not call for an expansion of the review system to add cumbersome and expensive evidentiary hearings with detailed findings, at least when the only property at stake is the right to sit for an examination. To do so would heap an excessive burden on the state in cases in which applications are denied. The Due Process Clause of the Fourteenth does not guarantee errorless administrative decisions. It assures only a procedure that is reasonably

nonetheless unquestionably recognized that a due process interest was at stake.

Second, there is some question whether the *Charry* holding is even relevant to the instant plaintiff's claims. Here, plaintiff is not attempting to circumvent the Board's policy of requiring (with some certain exceptions) that only law school graduates from accredited schools sit for the bar examination. Plaintiff has no reason to challenge such a policy because she was a successful graduate from an accredited law school. Rather, plaintiff challenges the Board's purportedly arbitrary and capricious determination that she was not entitled to accommodation in taking the bar examination. Therefore, plaintiff is not invoking the somewhat constitutionally suspect "right to take an examination"; rather, she is seeking to enforce her statutory right as a disabled individual to receive the accommodations to which she is entitled under law. The question for this Court, then, is whether plaintiff was denied her statutorily-entitled accommodations in an arbitrary and capricious manner in violation of federal due process.

### D. *Whether Statutory Violations Can Establish Due Process Claims*

There is no question that plaintiff was denied her rights under the ADA and Section 504 to have reasonable accommodations in the taking of the New York State Bar Examination. *See* Part I, *supra.* However, there is considerable question whether plaintiff can subsequently bootstrap this violation into a federal due process violation. Even if defendants arbitrarily and capriciously denied Dr. Bartlett the accommodations to which federal law entitled her, I cannot find that this rises to the level of either a substantive or procedural due process violation.

 First, under a substantive due process analysis, Dr. Bartlett has not shown that the existence of statutorily-created right under the ADA and Section 504 is a sufficient liberty or property interest that qualifies as a "fundamental right" requiring protection under the due process clause. While *Charry*

and *Schware* reveal that there may be a federally ensured liberty or property interest in the taking of a professional examination, as discussed above, that is not the interest at issue here. Rather, here plaintiff challenges the defendants' failure to grant her accommodations in the examination—not their refusal to allow her to take the examination itself. Hence, I do not find that this failure to uphold plaintiff's statutory rights under the ADA and Section 504 amounts to a sufficient liberty or property interest under the due process clause to give plaintiff a claim. *Cf., Sutton v. Marianna School District A.,* 573 F.Supp. 159, 165 (E.D.Ark.1983) (providing that where plaintiff has a cause of action based on a state statute which provides her with "a full remedy ... consistent with Federal due process requirements," her federal constitutional rights are protected because "[t]o hold otherwise would be to provide a basis for bootstrapping every cause of action based on state law into a Section 1983 case.").

 Under a procedural due process analysis, there might be a more cogent argument available to plaintiff, but it, too, must fail. While the federal statutes entitling her to accommodations may constitute a sufficient deprivation to entitle plaintiff to predeprivation procedures, I cannot find under these facts that plaintiff was denied such predeprivation protection. Applying the *Mathews v. Eldridge* analysis, *see* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (requiring that in considering procedural due process claims courts consider three factors: "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."), I find that while it is unquestionably true that the Board's procedures resulted in an erroneous result at least in this case and

calculated to protect a person's property right. The review procedure here met that standard.

*Id.* at 146.

while it may be said that their methodology borders on the arbitrary, it is sufficient procedure to satisfy the federal due process clause.

▆▆▆ Furthermore, in effect, plaintiff seeks to alter the substantive rule employed by the Board, not the process due to her in that determination. She does not claim that the Board failed to give her notice or an opportunity to be heard; rather, she is disgruntled that the Board and its expert made the wrong conclusion about whether she was disabled and thereby deserving of accommodation. In effect, plaintiff is arguing that the substantive rule invoked by the expert and by the Board was arbitrary in that it used an arbitrary cutoff score that was applied in an uneven fashion.[32] Such a review of a substantive policy determination is beyond the

jurisdiction or authority of the Court under a procedural due process analysis.

### E. Reservations About Defendants' Conduct

Nevertheless, despite my holding that defendants' conduct does not rise to the level of a due process violation, I must pause to note some of the very disturbing findings that came to light in the course of this trial regarding defendants' policies and procedures.

As recognized by Dr. Vellutino, there is a serious measure of arbitrariness at play when learning disabled applicants are not advised of the criteria the Board is employing is assessing learning disabilities.[33] As previously discussed, Dr. Vellutino gives the benefit of the doubt to, and recommends

---

**32.** Plaintiff alleges that "[t]he Board's procedure for complying with the ADA is constitutionally inadequate because: (a) it relies on a single measure or type of measure (decoding cut-off) to determine learning disabilities; (b) said cut-off is admittedly arbitrary; and (c) the Board applies its policy in such an arbitrary and capricious fashion as to create an environment which fosters disparate treatment." (Pl. Post–Trial Brief at 69). She asserts that defendant's determination of which applicants are disabled under the law and thereby entitled to accommodations on the bar exam "must be based on a qualitative functional analysis rather than an underinclusive statistical test which even if it were applied uniformly would still violate the law because it draws an arbitrary line in the sand and excludes otherwise qualified applicants." (*Id.*)

**33.** The parties at trial did not present a survey of what law schools or other state bar examiners do in evaluating learning disability reports. Dr. Hagin recommended that schools or other entities like bar examiners evaluating a learning disability report simply accept the diagnosis of learning disability so long as the report is issued by a person trained or licensed to diagnose such disabilities and the report covers the four standard areas of information upon which psychologists rely in rendering a learning disability. (Tr. at 559–600, 562, 586–87.) Those four areas include information concerning the applicant's history, cognitive development, educational ability and reading sub-skills. (Tr. at 1587.) According to Dr. Hagin licensed, clinical or school psychologists are competent to diagnosis learning disabilities. (Tr. 562.) There is evidence in the record, however, that at least two law schools, the University of California Hastings College of the Law and the University of Houston Law Center, defines the criteria they use in determining whether a learning disability exists:

The four criteria necessary to establish a student's eligibility for learning disability adjustments or accommodations are: (1) average or above average intelligence as measured by a standardized intelligence test which includes assessment of verbal and non-verbal abilities; (2) the presence of a cognitive-achievement discrepancy or an intra-cognitive discrepancy indicated by a score on a standardized test of achievement which is 1.5 standard deviations or more below the level corresponding to a student's sub-scale or full-scale IQ; (3) the presence of disorders in cognitive or sensory processing such as those related to memory, language, or attention; and (4) an absence of other primary causal factors leading to achievement below expectations such as visual or auditory disabilities, emotional or behavioral disorders, a lack opportunity to learn due to cultural or socio-economic circumstances, or deficiencies in intellectual ability,

(Pl.'s 181 at 53, 169.) These criteria are closely akin to those used by Dr. Hagin. This law schools, like Dr. Hagin recommended, also require a report to be prepared by a "professional qualified to diagnose a learning disability, including but not limited to a licensed physician, learning disability specialist, or psychologist" and which covers basically the four areas of information also suggested by Dr. Hagin. (*Id.* at 53–54, 170.) Mr. Fuller reported at trial that most state bar examiners simply accept the diagnosis of learning disability submitted in a an applicant's report but that approximately ten states use experts in assisting them in reviewing applicants' documentation. (Tr. at 880–81.) At least one state, Michigan, uses a panel of four individuals—including a psychiatrist, a specialist in learning disabilities, and a judge—to evaluate a learning disability application. (Tr. at 882.)

accommodations for, any applicant who reports a word attack or word identification score at or below 30%, whether or not other scores support a conclusion of reading disability. Thus, applicants with test scores remarkably similar to Dr. Bartlett's were given accommodations because they happened to supply a word attack or word identification score below 30% with their first application. Plaintiff, unfortunately for her, only sent Dr. Massad's Form H report with her first application. On that Form, she received scores of above the 30th percentile. Only Dr. Heath first tested plaintiff on Form G. There, she scored in the 28th percentile on the word attack portion of the test. Dr. Vellutino, however, did not give her the benefit of the doubt because he concluded that the report was an anomaly, emphasizing instead other test scores that demonstrated above average, if not superior, reading facility. (Tr. at 1303–05, 2118–19, 2167.)

Recognizing the lack of "concordance" in defining a learning disability, Dr. Vellutino testified at trial that he has recommended to the Board that it not attempt to "get into the business of" trying to evaluate learning disabled applicants. (Tr. at 1997.) Instead, he has recommended that the Board give untimed power tests designed to assess minimum competence by testing specific skills. (Tr. at 1998, 2002, and 2004–005.) The Board has rejected this recommendation. In short, the Board's decision to continue this methodology, despite knowing its deficiencies, leaves much to be desired and suggests an element of arbitrariness, irrationality and capriciousness——even though I cannot find under the law that it rises to the level of a procedural due process violation. Nevertheless, the Board's continued use of its procedures may, in the future, subject it and its members to possible liability under the ADA and the Rehabilitation Act.

## IV. PLAINTIFF'S SECTION 1983 CLAIM [34]

Because I have concluded, above, that plaintiff has failed to establish that her rights

under the equal protection or due process clauses of the Constitution were violated by the defendants, the only remaining arguable basis for plaintiff's § 1983 claim is the underlying statutory violations of the Rehabilitation Act and the ADA. *See Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980) (providing that Section 1983 provides a cause of action for violations of federal statutes as well as the Constitution). However, it is important to note that not every statutory violation is actionable under § 1983. Rather, the Supreme Court has set forth two important exceptions to the general rule that § 1983 remedies deprivations of federally secured rights. In *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 2516–17, 110 L.Ed.2d 455 (1990), the Supreme Court succinctly stated the two exceptions:

> "A plaintiff alleging a violation of a federal statute will be permitted to sue under § 1983 unless (1) 'the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983,' or (2) 'Congress has foreclosed such enforcement of the statute in the enactment itself.'"

*Id.* (citing *Wright v. Roanoke Redevelopment & Housing Authority,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987)).

Here, plaintiff's case clearly does not fall within the first exception because it is undeniable that the ADA and the Rehabilitation Act create enforceable rights; plaintiff has now successfully litigated and secured such rights in this Court. However, it is equally clear that Congress would not have intended that plaintiffs seek redress for violations of their ADA and Rehabilitation Act rights through the vehicle of § 1983. Despite the Supreme Court's admonition that "[w]e do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally

---

**34.** Section 1983 provides:

Every person who, under color of [law] subjects or causes to be subjected any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the

Constitution *and laws,* shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis added).

secured right," *id.* at 520, 110 S.Ct. at 2523 (citations and internal quotation marks omitted), I find that this is one of the limited cases in which Congress did not intend for individuals like plaintiff to seek remedy through § 1983. I note that "[t]he burden is on the State to show by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." *Id.* at 520–21, 110 S.Ct. at 2523. Where, however,—as here—"the Act [itself] does not expressly preclude resort to § 1983," *id.,* the Court has found "private enforcement foreclosed only when the statute itself creates a remedial scheme that is 'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.' " *Id.* Unquestionably, the ADA and the Rehabilitation Act [35] provide such "sufficiently comprehensive" remedies for violations of plaintiff's rights that I do not countenance allowing plaintiff to recover under § 1983 as well. *See Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (holding that the Adoption Assistance and Child Welfare Act of 1980 does not create a federally enforceable right under § 1983 because the language of the Act could be read "to impose only a rather generalized duty on the State, to be enforced not by private individuals, but by the Secretary...."); *Messier v. Southbury Training School,* 916 F.Supp. 133, 142–46 (D.Conn.1996) (discussing precedent in this context and assessing whether *Suter* obviated the *Wilder* analysis with respect to the first exception).

## V. PLAINTIFF'S DAMAGES

Having concluded that plaintiff's rights under the ADA and the Rehabilitation Act were violated, I now move to the question of damages. First, I will consider whether the individually-named defendants are entitled to qualified immunity for their conduct. Then, I will assess whether plaintiff can recover

injunctive relief, declaratory relief, compensatory damages, and punitive damages.

### A. Qualified Immunity

In a recent opinion, the Second Circuit succinctly summarized the law of qualified immunity:

> Public officials are entitled to qualified immunity from claims for damages if (1) their conduct did not violate federal statutory or constitutional rights that were clearly established at the time, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. In determining whether a right was clearly established, we consider (1) whether the right in question was defined with 'reasonable specificity', (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question, and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Brown v. City of Oneonta,* 106 F.3d 1125, 1130–31 (2d Cir.1997) (citations and internal quotation marks omitted).

### 1. Clearly Established Right

As noted above, there is a three-prong test to determine whether a right was "clearly established" at the time of defendant's conduct. *See id.* First, the Court must look to whether the right was defined with "reasonable specificity." Here, the right at issue was plaintiff's entitlement to reasonable accommodations in the taking of the state bar examination. As can be seen from the lengthy discussion above, this Court is of the opinion that plaintiff's entitlement to accommodations in the taking of the bar examination was not defined with reasonable specificity under either statute. Nor, under the second prong of the test, was the case law immensely helpful on this question. Therefore, under the third prong of the test,

**35.** When I refer to the "Rehabilitation Act," it must be remembered that I am referring to the provisions of the Act under which plaintiff's cause of action is brought—not other provisions or Titles of the Act. I note this because the Second Circuit has held that violations of Title I of the Act—which does not provide for a private

cause of action—can be redressed via a § 1983 action. *See Marshall v. Switzer,* 10 F.3d 925, 930 (2d Cir.1993) (noting that the Supreme Court typically forbids prosecution under § 1983 whore "the statutes at issue themselves provide[] for private judicial remedies, thereby evidencing

I must conclude that a reasonable defendant would not have understood that his or her acts were unlawful. This Court had to go to extraordinary lengths to determine whether plaintiff was substantially impaired under the law and to evaluate the many disagreements among the experts. I cannot find, therefore, that the individual defendants acted unreasonably when they determined that plaintiff was not disabled under the law.

### 2. Objectively Reasonable Conduct

However, even if I were to find that plaintiff's right to reasonable accommodations on the bar examination were "clearly established" at the time of defendants' conduct, I nevertheless would conclude that the defendants' conduct was objectively reasonable. Defendants seemingly made an attempt to comply with the statutes. Their only error was in the base group to which they compared plaintiff, and this error was only exacerbated by the tremendous degree of confusion in the literature of learning disabilities regarding what constitutes a learning disability—as well as the somewhat unsettled state of the law regarding whether a professional licensing examination is a "work activity" (and necessarily whether the legal profession is a sufficiently "broad" category of jobs) entitling plaintiff to be compared to a population with similar skills, training, and experience. *See Giacalone v. Abrams*, 850 F.2d 79, 85 (2d Cir.1988) (requiring the Court "to consider the operation of the rule in the context of the circumstances with which [the

official] was confronted."). Because the Court itself was challenged by the legal issues presented in this case, I cannot deem defendants' conduct objectively unreasonable. I remain mindful of the policies underpinning the doctrine of qualified immunity, which provide that:

> The doctrine of qualified immunity attempts to balance the strong policy of encouraging the vindication of federal civil rights by compensating individuals when those rights are violated, with the equally salutary policy of attracting capable public officials and giving them the scope to exercise vigorously the duties with which they are charged, by relieving them from the fear of being sued personally and thereby made subject to monetary liability.

*Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir.1995). For these reasons, and because I find that their conduct was objectively reasonable, I conclude that all of the individually-named defendants are entitled to qualified immunity.[36]

### B. Injunctive and Declaratory Relief

Having demonstrated that she is disabled under the ADA and the Rehabilitation Act, plaintiff is entitled to injunctive relief in the form of reasonable accommodations on the bar examination. Plaintiff seeks the following injunctive relief: "double time;[37] the use of a computer;[38] permission to circle multiple choice answers in the examination booklet and large print on both the New York State and Multistate Bar Exam."

congressional intent to supplant the § 1983 remedy.").

**36.** Because I find that all of the individual defendants are entitled to qualified immunity, I need not reach the question whether individual liability exists under either Act. *See, e.g., Lane v. Maryhaven Center of Hope*, 944 F.Supp. 158, 161 (E.D.N.Y.1996) (recognizing that the Second Circuit has not yet answered the question whether individual liability exists under the ADA, but analyzing lower court cases as well as Second Circuit precedent under Title VII and concluding that individual liability does not exist).

**37.** Mr. Fuller testified in his trial affidavit that the Board has provided "up to four days for taking the examination" to other applicants. (Fuller Aft. ¶ 86.) The Board has proffered no reason why plaintiff's requested accommodation

for double time is unreasonable. Accordingly, I find the requested four days to be a reasonable accommodation in this case.

**38.** Although there was testimony at trial that Mr. Fuller and the Board were "resistan[t]" to the use of computers on the bar examination, (*see* Tr. at 887–893), I find the use of a computer or wordprocessor to be a reasonable accommodation. Any of the Board's security concerns about the use of a computer can be alleviated either by a computer technician's inspection of the hardware before each session of the examination, or, in the alternative, by the use of a proctor to monitor the applicant's use of the computer during the examination. Moreover, the Board's arguments carry little weight to the extent the Board admits that it has approved the use of computers by other applicants in the past. (Tr. at 890.)

(Pl.'s Post–Trial Mem. at 83.) I agree that plaintiff is entitled to this injunctive relief under the Act. I do not conclude, however, that declaratory relief is appropriate in this case. As defendants aptly point out, this is not a class action, and plaintiff does not have standing to seek declaratory relief, or any relief beyond that relief necessary to remedy her individual claim. Accordingly, I grant plaintiff the individual, injunctive relief she seeks under the act. *Cf., D'Amico v. New York State Board of Law Examiners,* 813 F.Supp. 217, 223–24 (W.D.N.Y.1993) (granting preliminary injunction requiring Board to provide all testing accommodations recommended by applicant's physician, including the provision of a "four-day testing schedule consisting of six hours of testing per day plus a one hour lunch break each day.").

### C. Compensatory Damages

 As one court has noted, "[t]he relief provisions of Title II of the ADA are complex; one must trace a chain of legislation and caselaw through several steps to reach the operative law." *Tafoya v. Bobroff,* 865 F.Supp. 742, 748 (D.N.M.1994), *aff'd,* 74 F.3d 1250 (10th Cir.1996). The curious labyrinth begins with the damages provision of the ADA, which states that the "remedies, procedures, and rights" under the Act "shall the be the remedies, procedures, and rights" provided under the Rehabilitation Act. 42 U.S.C.

§ 12133.[39] The Rehabilitation Act, in turn, provides that for "any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title," the damages available shall be the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d *et seq.*] ..." 29 U.S.C.A. § 794a(2). Unfortunately, because Title VI of the Civil Rights Act was an implied cause of action instituted by the Courts rather than Congress, there is some uncertainty regarding what damages are available to plaintiffs under Title VI, particularly in cases where there is no clear evidence of intentional discrimination.

### 1. Whether (and What) Intent is Required to Recover Compensatory Damages

Most, but not all, courts agree that compensatory damages are recoverable under the ADA and Section 504 only in cases involving intentional discrimination. *See, e.g., Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 630–31, 104 S.Ct. 1248, 1252–53, 79 L.Ed.2d 568 (1984) (providing that "[w]ithout determining the extent to which money damages are available under § 504, we think it is clear that § 504 authorizes a plaintiff who alleges intentional discrimination to bring an equitable action for backpay."); *Wood v.*

---

**39.** In making this pronouncement, the ADA provision is unclear, however. It refers to "section 794a of Title 29" (which is the Rehabilitation Act damages provision) without specifying whether § 794a(a)(1) or § 794a(a)(2) is the operative and controlling provision for purposes of the ADA. Unfortunately, this is a critical distinction. Subsection 794a(a)(1) provides that the "remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964" shall control Rehabilitation Act claims brought under section 791 of the Rehabilitation Act. 29 U.S.C. § 794a(a)(1). Subsection 794a(a)(2), however, states that Rehabilitation Act claims brought under "section 794 of this Title"—(Section 504 of Rehabilitation Act) shall be governed by the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964." *See* 29 U.S.C. § 794a(a)(2).

Despite the lack of clarity in the provision, numerous courts have stated that the damages provision controlling the ADA is the damages provision of Section 504 of the Rehabilitation Act, or § 794a(a)(2), which looks to the remedies provided under Title VI of the Civil Rights Act.

*See, e.g., Tafoya v. Bobroff,* 865 F.Supp. 742, 748–750 (D.N.M.1994) (discussing the important differences between § 794a(a)(1) and (a)(2), and concluding that the ADA is governed by § 794a(a)(2)); *Hernandez v. City of Hartford,* 959 F.Supp. 125, 133 (D.Conn.1997) (providing, without explanation or distinction between § 794a(a)(1) and (a)(2) that the damages remedy of the ADA should be the same as the damages available under the Rehabilitation Act). Because this Court believes that Congress intended Section 504 damages to govern ADA claims—not the provisions of the Rehabilitation Act that deal with administrative determinations, I will follow the lead of my colleagues and analyze plaintiff's claim under § 794a(a)(2), which then requires me to look to the remedies outlined in Title VI of the Civil Rights Act of 1964.

I should also note that defendants concede that § 794a(a)(2), pointing as it does to Title VI, is the appropriate provision for establishing damages under the ADA. (*See* Defs.' Post–Trial Mem. at 122 & n. 20.)

*President & Trustees of Spring Hill College,* 978 F.2d 1214, 1219–20 (11th Cir.1992) (providing that "controlling precedent on Title VI remedies, made applicable to section 504 actions under the Rehabilitation Act, indicates that compensatory damages are precluded in cases of unintentional discrimination, but are permissible on a showing of intentional discrimination.") (citing, *inter alia, Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Franklin v. Gwinnett County Public Schools,* 911 F.2d 617, 621 (11th Cir.1990), *rev'd on other grounds,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)); *Naiman v. New York University,* 1997 WL 249970, *5 (S.D.N.Y.1997) (providing that while "there is still some disagreement as to the scope of available remedies under the [Rehabilitation Act], most courts agree that compensatory damages are available"; leaving aside question whether intent was required since sufficient intent could be inferred from the fact that plaintiff requested an accommodation and was denied it); *Sharp v. Abate,* 887 F.Supp. 695, 699 (S.D.N.Y.1995) (stating in wrongful termination case that "[c]ompensatory damages, including emotional damages, as well as punitive damages are available under the ADA," without expressly holding that a finding of intent was required); *Zaffino v. Surles,* 1995 WL 146207, *2–3 (S.D.N.Y. 1995) (surveying the law after *Franklin* and concluding that *"Franklin* strongly suggests that Title VI and [the Rehabilitation Act] should be read as authorizing all traditional legal and equitable remedies" but noting that at least in instances of intentional discrimination, there should be no distinction between the recovery of pecuniary versus non-pecuniary damages); *Hernandez v. City of Hartford,* 959 F.Supp. 125, 133 & n. 10 (D.Conn. 1997) (following the Court's prior analysis finding that *Franklin* dictated that damages were available under the Rehabilitation Act, the Court extends this analysis to the ADA but distinguishes a case from another jurisdiction on the grounds that that case did not involve intentional discrimination); *DeLeo v. City of Stamford,* 919 F.Supp. 70, 72–74 .

(D.Conn.1995) (concluding that *Franklin* mandates that compensatory damages are recoverable under the Rehabilitation Act); *Adelman v. Dunmire,* 1996 WL 107853, *4 (E.D.Pa.1996) ("Compensatory damages are ... unavailable absent an allegation and proof of an intentional violation of Title II."); *Tyler v. City of Manhattan,* 849 F.Supp. 1442, 1444 (D.Kan.1994) (concluding that especially in cases of unintentional discrimination, compensatory damages under the ADA are not available). *But see Wilder v. City of New York,* 568 F.Supp. 1132 (E.D.N.Y.1983) (holding that "[a]lthough the Court in *Guardians Assn.* requires a showing of discriminatory intent before awarding damages, such a showing is unnecessary here. Section 504 differs from Title VI in that discriminatory intent is not essential to a violation of the Rehabilitation Act.").[40]

Much of this conclusion rests on the Supreme Court's holding in *Guardians Ass'n v. Civil Service Comm'n of the City of New York,* 463 U.S. 582, 598, 103 S.Ct. 3221, 3230, 77 L.Ed.2d 866 (1983) and its progeny which provides that intentional discrimination is a prerequisite to recovery under Title VI. In *Guardians,* a much-divided Supreme Court explained why a finding of intent was necessary:

> Since the private cause of action under Title VI is one implied by the judiciary rather than expressly created by Congress, we should respect the foregoing considerations applicable in Spending Clause cases and take care in defining the limits of this cause of action and the remedies available thereunder....
>
> In the typical case where deliberate discrimination on racial grounds is not shown, the recipient [of federal funds] will have at least colorable defenses to charges of illegal disparate-impact discrimination, and it often will be the case that, prior to judgment, the grantee will not have known or have had compelling reason to know that it had been violating the federal standards. Hence, absent clear congressional intent or guidance to the contrary, the relief in pri-

**40.** For a cogent discussion of the Section 504 damages question, *see generally* Sarah Poston, *Developments in Federal Disability Discrimina-* *tion Law: An Emerging Resolution to the Section 504 Damages Issue,* 1992/1993 Ann. Surv. Am. L. 419.

vate actions should be limited to declaratory and injunctive relief ordering future compliance with the declared statutory and regulatory obligations. Additional relief in the form of money or otherwise based on past unintentional violations should be withheld.

*Id. But see Consolidated Rail Corp.*, 465 U.S. at 630 n. 9, 104 S.Ct. at 1252 n. 9 (explaining that when all the votes were tallied in *Guardians* "[a] majority of the Court agreed that retroactive relief is available to private plaintiffs for all discrimination, *whether intentional or unintentional,* that is actionable under Title VI.") (emphasis added).

The Supreme Court's more recent holding in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 74, 112 S.Ct. 1028, 1037, 117 L.Ed.2d 208 (1992) permitting compensatory and punitive damages under Title IX of the Civil Rights Act further explains the Court's thinking on this question. There the Court stated that "[t]he point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award. This notice problem does not arise in a case such as this, in which intentional discrimination is alleged." *Id.* at 74–75, 112 S.Ct. at 1037.

As plaintiff aptly alludes in her papers, however, the concept of intent in an accommodations case such as this one is markedly different from the concept of intent in employment discrimination cases or in cases involving a palpable bias or animus against disabled persons. In those cases, there is a negative action taken toward an employee because of his or her disability (most often a termination or an alteration in the terms or conditions of employment) or an adverse action taken against a group of disabled individuals because of their disability. In the instant case, however, as in all accommodations cases, the concept of intent is more difficult to pinpoint because it is the defendants' failure to provide the plaintiff with an advantage which is the very subject of the "discrimination." In this sense, an accommodations case falls somewhere between the "disparate impact" sort of discrimination case

to which the Supreme Court referred in *Guardians* and *Franklin* and the sort of direct, intentional discrimination that is the run-of-the-mill discrimination case in the employment context.

Here, it is clear that defendants did something intentionally. It was not that they had a facially neutral policy which resulted in a disparity of disabled individuals being adversely impacted, as was the case in the Title VI cases discussed in *Guardians* and *Franklin.* Rather, defendants *intentionally* withheld from plaintiff an accommodation to which this Court has deemed she was entitled. Clearly, defendants were of the opinion that under the law, Dr. Bartlett was not a disabled individual, but one cannot say that they were without notice that Dr. Bartlett was claiming a disability. And notice is what the Supreme Court appeared concerned with in both *Guardians* and *Franklin.* As plaintiff writes in her Post–Trial Reply brief:

> Most reasonable accommodations case [sic] do not raise issues of lack of notice because they arise only after a defendant has rebuffed a specific request from a person with a disability. In such a situation, the defendant is put on notice before the filing of the lawsuit. The risk of surprise is not a [sic] great as it may be in disparate impact disputes.

(Pl.'s Post–Trial Reply Mem. at 68). Therefore, it is fair to charge defendants with notice, and thereby intent, of their wrongful failure to provide a reasonable accommodation. Undoubtedly, the defendants believed what they were doing was within the confines of the law (*but see* Pl.'s Post–Trial Reply at 59–61 (detailing defendants' admitted errors and inconsistencies in the processing of accommodations applications and discussing Department of Justice investigation of Board for its failures)), but it could be said that almost every defendant harbors such a belief. The question really is, then, who pays the price for the inherent miscalculation in such a belief, especially where, as here, it is clear that defendants at least negligently arrived at their conclusion that Dr. Bartlett was not learning disabled.

The Supreme Court's analysis in *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83

L.Ed.2d 661 (1985) is somewhat instructive on the question of what level and sort of intent should be required to trigger damages under the Acts. There, the Court held that Congress intended the Rehabilitation Act to cover instances of non-intentional discrimination. Although the Court did not address the question of damages, the Court explained that "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.... Federal agencies and commentators on the plight of the handicapped similarly have found that discrimination against the handicapped is primarily the result of apathetic attitudes rather than affirmative aninus." *Id.* at 296, 105 S.Ct. at 718. The Court recognized and affirmed that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not, impossible to reach were the Act construed to proscribe only conduct fueled by a *discriminatory intent.*" *Id.* at 296–97, 105 S.Ct. at 718. The Court explained:

For example, elimination of architectural barriers was one of the central aims of the Act, yet such barriers were clearly not erected with the aim or intent of excluding the handicapped.... And Senator Humphrey, again in introducing the proposal that later became § 504, listed, among the instances of discrimination that the section would prohibit, the use of "transportation and architectural barriers," the "discriminatory effect of job qualification ... procedures," and the denial of "special educational assistance" for handicapped children. These statements would ring hollow if the resulting legislation could not rectify the harms resulting from action that discriminated by effect as well as by design.

*Id.* at 297, 105 S.Ct. at 718. Likewise, in the instant case, it could be similarly argued that "much of the conduct that Congress sought to alter in passing" the Rehabilitation Act as well as the ADA "would be difficult if not impossible to reach" if the Acts are construed only to provide damages for that "conduct fueled by a discriminatory intent." *Id.* at 296–97, 105 S.Ct. at 718. While *Alexan-*

*der*'s holding extending the Rehabilitation Act's reach to disparate impact cases is admittedly a far cry from a holding that compensatory damages may be recovered in such cases, I think the case helps illustrate the purposes of Congress in passing the Rehabilitation Act, and by extension, the ADA. At the very least, it demonstrates an awareness on the part of the Supreme Court that the concept of intent differs markedly in accommodations cases, and hence that a different conception of intent is appropriate for recovery of compensatory damages in non-employment accommodations cases.

In *Wilder v. City of New York,* 568 F.Supp. 1132 (E.D.N.Y.1983), Judge McLaughlin (then of the Eastern District) used an analogous logic to dispense with the intent requirement altogether in accommodations cases. He wrote:

Although the Court in *Guardians Assn.* requires a showing of discriminatory intent before awarding damages, such a showing is unnecessary here. Section 504 differs from Title VI in that discriminatory intent is not essential to a violation of the Rehabilitation Act.

*Id.* at 1136. A short time ago, Judge McKenna of this Court, without answering the question whether intent was a prerequisite to the recovery of compensatory damages, found intent where a reasonable accommodation was denied. He wrote:

Assuming that intent is a prerequisite for monetary relief under the [Rehabilitation Act], [plaintiff's] allegation that he requested a qualified interpreter, which was not provided, coupled with the absence of any allegation that [the defendant] attempted to provide [the plaintiff] with effective communication, sufficiently alleges intent.

*Naiman v. New York University,* 1997 WL 249970, *5 (S.D.N.Y.1997). *See also J.L. v. Social Security Administration,* 971 F.2d 260, 262–265 (9th Cir.1992) (providing that plaintiffs could recover compensatory damages where they were denied reasonable accommodations in the procedure for security social security benefits); *Greater Los Angeles Council on Deafness v. Zolin,* 812 F.2d 1103, 1106–09 (9th Cir.1987) (permitting ac-

tion for monetary relief to proceed in case involving refusal to provide interpreters to prospective jurors who were deaf).

■ In the end, what all of these cases reveal, and what the clear policy of Congress mandates,[41] is that the question of intent in accommodations cases does not require that plaintiff show that defendants harbored an animus towards her or those disabled such as she. Rather, intentional discrimination is shown by an intentional, or willful, violation of the Act itself. With this understood, it becomes clear, that while defendants may have had the best of intentions, and while they may have believed themselves to be within the confines of the law, they nevertheless intentionally violated the ADA and the Rehabilitation Act by willfully withholding from plaintiff the reasonable accommodations to which she was entitled under the law. They had notice of the potential risk of their decision, and clearly refused the accommodation knowingly. Therefore, to the extent that intent may be held to be required for recovery of damages under the Acts, plaintiff has met her burden of proof on this issue, and she is entitled to compensatory damages.

**41.** Congress clearly intended to provide for compensatory damages in situations such as the instant case. As plaintiff describes in her Post–Trial Reply Memorandum:

> Senator Harkin, the chief sponsor of the [ADA] in the Senate, emphasized that damages were available to private litigants under Title II:
> It is true that the employment provisions of title I make available the rights and remedies of title VII of the Civil Rights Act, which provides for backpay and equitable relief. Also under ... title III, the bill expressly limits relief to equitable remedies. *However, title II of the Act, covering public services, contains no such limitations. Title II of the bill makes available the rights and remedies also available under Section 505 of the Rehabilitation Act, and damages remedies are available under ... section 504 of the Rehabilitation Act and, therefore also under title II of this bill.*
> 135 Cong. Rec. 19,855 (1989) (emphasis added).

(Pl.'s Post–Trial Reply Mem. at 65.)

**42.** It should be noted that in the 1991 Amendment to the Civil Rights Act, Congress established, in essence, a good faith defense for defendants who have wrongfully denied plaintiffs a reasonable accommodation. The Act states:

### 2. The 1991 Amendment to the Civil Rights Act

■ Although this case, as discussed above, implicates—for purposes of determining whether plaintiff is "substantially impaired"—the "major life activity of working," I cannot say that this is an "employment case." Therefore, the 1991 Amendment to the Civil Rights Act is inapplicable as it pertains only to individuals who have been discriminated against by employers making employment decisions. *See* 42 U.S.C. § 1981a(a). The defendants in this case are not employers; rather, they are the legal entity charged with testing bar applicants who are seeking professional licenses to practice law. There were no terms or conditions of employment at issue and therefore the 1991 Amendment to the Civil Rights Act is not relevant. *See, e.g., Tyler v. City of Manhattan,* 849 F.Supp. 1442, 1445 (D.Kan.1994) (holding that because "the Civil Rights Act of 1991 amended only those portions of the ADA that prohibit discrimination in employment ... [and because] [t]he plaintiff's claims in this case have nothing to do with employment ... the Civil Rights Act of 1991 does not entitle plaintiff to compensatory damages....").[42]

> In cases where a discriminatory practice involves the provision of a reasonable accommodation pursuant to section 102(b)(5) of the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12112(b)(5)] or regulations implementing section 791 of Title 29, damages may not be awarded under this section where the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business.

42 U.S.C.A. § 1981a(a)(3). Again, however, by the express language of the provision (including the last line which refers to the "operation of the business"), this rule applies only in employment cases, not in a case covered by Title II of the ADA. Furthermore, I cannot say that defendants made a good faith effort "to identify and make a reasonable accommodation" to plaintiff. Although defendants may have been acting in good faith when they attempted to discern whether plaintiff was learning disabled, because of their faulty conclusion on that question, they never reached the point where there were making a good faith effort to accommodate her.

# 1152

### 3. Computation of Compensatory Damages

[■■■] Having found that compensatory damages are appropriate, I now move to the question of what damages have been proven in this case. Although plaintiff submitted evidence and testimony regarding purported losses in salary and benefits (and the accompanying incurring of greater debt) that she suffered as a result of not having passed the bar examination, (see Letter from Jo Anne Simon to the Court (May 28, 1996)), I find that these calculations are unduly speculative. As defendants correctly point out, "plaintiff has failed to prove that with accommodations she would have passed the Bar exam." (Letter from Gregory J. McDonald to the Court (Aug. 28, 1996)). Although this Court holds the greatest hope for Dr. Bartlett's ability to pass the bar examination, the painful truth is that even when she was granted accommodations on the examination pursuant to this Court's preliminary injunction, she did not pass. Although the Court accepts that plaintiff may have had difficulty adjusting to the use of a amanuensis, the fact remains that even when plaintiff was granted the accommodations she desired in law school, her grade point average and/or class standing did not appreciably improve. Moreover, she did not pass the Pennsylvania Bar Examination in which she was given the accommodations she requested. These facts, coupled with the inherent speculation of predicting what one's career might have become and whether or not another law firm would have hired plaintiff after her original law firm disbanded, render a great portion of plaintiff's claim for compensatory damages unduly speculative.[43] Cf. Edward A. Adams, *ABA Sees Lingering Problems at CUNY Law School*, N.Y. L. J., April 22, 1996, at 1 (providing that while the state-wide passing rate on the bar examination is roughly 80%, at some schools it is as low as 39%).

What is clear is that plaintiff's taking of the bar examination without the accommoda-

tions to which she was entitled under the law was a waste of her time and money. For these losses, plaintiff should be reimbursed. Plaintiff claims that she "incurred costs of $2,500" for each of the five bar examinations that she took. (See Letter from Jo Anne Simon, supra, at 2 ("$2,500 for each of four additional bar examinations"); Pl.'s Post–Trial Mem. at 82 (plaintiff "incurred the expenses associated with taking the Bar Exam and bar review courses five (5) times").) The Court accordingly awards plaintiff compensatory damages in the amount of $12,500.00.

### D. Punitive Damages

[■■■] As with compensatory damages, courts are divided on the question of whether punitive damages are recoverable under the ADA and/or the Rehabilitation Act, especially as against a governmental entity. Compare *U.S. Equal Employment Opportunity Comm'n v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1285–1287 (7th Cir.1995) (upholding compensatory and punitive damages award in ADA employment case); *Sharp v. Abate*, 887 F.Supp. 695, 699 (S.D.N.Y.1995) (Kaplan, J.) (holding that "[c]ompensatory damages, including emotional damages, *as well as punitive damages* are available under the ADA.") (emphasis added); *DeLeo v. City of Stamford*, 919 F.Supp. 70, 72–74 & n. 4 (D.Conn.1995) (holding that "punitive damages are included within the full panoply of remedies and must be available for a violation of the Rehabilitation Act 'absent clear direction to the contrary by Congress.'"); *Kilroy v. Husson College*, 959 F.Supp. 22, 24 (D.Maine 1997) (providing that punitive damages are recoverable under the ADA); *Kedra v. Nazareth Hospital*, 868 F.Supp. 733, 740 (E.D.Pa.1994) (concluding after discussion that punitive damages are recoverable under Section 504) *with Moreno v. Consolidated Rail Corp.*, 99 F.3d 782, 784 (6th Cir.1996) (holding that punitive damages are not recoverable under Section 504); *Adelman v. Dunmire*, 1996 WL 107853, *4

---

**43.** As for plaintiff's assertions regarding the mental pain and humiliation that she suffered as a result of not passing the bar examination, I likewise cannot find that such damages, if incurred and recoverable, should be recompensed. It is impossible to separate the pain and humiliation suffered by plaintiff because she failed the exam without accommodations, from the pain and humiliation she might have felt, as do many unsuccessful bar exam applicants, from failing the exam even with accommodations. Hence, I do not grant plaintiff damages for mental anguish.

(E.D.Pa.1996) (providing that "punitive damages are not available from a governmental entity"); *Harrelson v. Elmore County, Alabama, City of Millbrook, Alabama,* 5 Nat. Disability Law Rep. 297, 859 F.Supp. 1465 (M.D.Ala.1994) (holding that "punitive damages are not available to a plaintiff asserting a claim under Title II of the ADA" in part because "Congress' express provision of punitive damages under Title I of the ADA via the Civil Rights Act of 1991 counsels against a statutory construction that punitive damages are available under Title II by inference."). However, I need not address the question whether punitive damages are available under either Act in this case because even if I found them to be available, I would conclude that defendants' conduct do not warrant them. *Cf., Luciano v. Olsten Corp.,* 110 F.3d 210, 220–21 (2d Cir.1997) (providing that the statutory standard for punitive damages under Title VII and under the 1991 Amendment to the Civil Rights Act is the "same as the language in other civil rights laws": punitive damage are appropriate where a defendant discriminates "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."); *Kilroy v. Husson College,* 959 F.Supp. 22, 24 (D.Maine 1997) (providing that punitive damages are recoverable under the ADA "if a plaintiff demonstrates that her employer 'engaged in discriminatory behavior with 'malice' or 'reckless indifference' to her federally protected rights.'"). Because of the "chaos" in the learning disability field and the ambiguity in the law, I do not find the level of "malice" or "reckless indifference" to federally protected rights that would justify an award of punitive damages.

## CONCLUSION

For the reasons discussed, I find that plaintiff is disabled under the ADA and under Section 504 and that the Board's failure to accommodate her reasonably on the New York State Bar Examination amounted to discrimination under the ADA and Section 504. I do not find, however, that plaintiff has established an equal protection, due process, or a § 1983 violation by defendants.

I further conclude that all of the individually-named defendants are entitled to qualified immunity and that plaintiff is entitled to injunctive relief in the form of reasonable accommodations on the examination. I award compensatory damages in the amount of $12,500.00. I do not award punitive damages.

Plaintiff shall also receive the following reasonable accommodations in the taking of the bar examination, should she decide to retake it in the future:

(1) double time over four days;

(2) the use of a computer;

(3) permission to circle multiple choice answers in the examination booklet; and

(4) large print on both the New York State and Multistate Bar Examinations.

*The Clerk of the Court is hereby directed to enter judgment in accordance with this Opinion.*

**SO ORDERED.**